BULTE v. IGLEHEART BROS. et al.

(Circuit Court of Appeals, Seventh Circuit. April 11, 1905.)

No. 1,078.

**1. APPEAL—PARTIES—ASSIGNMENT.**

Where, during the pendency of an action by a firm to restrain an alleged infringement of a trade-mark, one of its members filed an amended complaint alleging an assignment to him of the other member's interest in the subject-matter of the suit, but the master found that the alleged assigning member was still interested, that he had agreed to assume one-half the cost and expense of the suit, and that the damages recovered by or against the firm were to be assumed by the two members in equal proportions, both were necessary parties to an appeal from a decree dismissing the bill.

**2. TRADE-MARKS—ASSIGNMENT—VALIDITY.**

An assignment of a flour trade-mark, disassociated from the business in which it was used and in which it had acquired its value by association with the manufacture of flour by the originator and his successors, was void.

**3. SAME—PLEADING.**

Complainants in an original bill to restrain infringement of a flour trade-mark alleged that L., under whom they claimed, originated it in 1865, and described it as a circular label having thereon a circle within which was a smaller circle, and within this a pictorial representation of a body of water on which was a white swan; that above the picture was the name of the manufacturers, and beneath the words "White Swan," the name of the manufacturers, the location of the manufacturers' plant, and at the top the figures "196." Thereafter complainants filed an amendment asserting that in the year 1880 they originated the brand subsequently mentioned, to wit, the picture of a white swan together with the words "White Swan," in a manner entirely independent of any of their said predecessors, and had continuously used it in their business up to and including the date of filing the bill. *Held*, that the allegations were inconsistent, and that the amendment constituted an admission that complainants pirated the mark previously belonging to L. and his successors.

**4. SAME—PRIOR USE.**

Where at least 15 years prior to complainants' appropriation of a flour trade-mark containing the words "White Swan" and the picture of a swan floating on water such words had been quite generally used, and the picture of the swan, etc., had been adopted and used by at least two other firms, complainants were not entitled to claim that they were the originators of the brand, though they changed the arrangement of the marks and picture in immaterial respects.

**5. SAME—UNFAIR COMPETITION.**

Where complainants had no exclusive right to the use of the picture of a white swan floating on water, or to the name "Swan," as applied to a flour trade-mark, and there was no proof of a single instance in which the public had been deceived by the points of similarity of defendant's trade-mark, containing such name and symbols, defendant was not guilty of unlawful competition.

[Ed. Note.—Unfair competition, see notes to Scheuer v. Muller, 20 C. C. A. 165; Lare v. Harper & Bros., 30 C. C. A. 376.]

**6. SAME—BILL—AMENDMENT—DISCRETION.**

Where, in a suit to restrain infringement of a trade-mark, the appeal record did not show either the ground on which an application for an amendment to the bill was made nor the amendment which was proposed. the exercise of the court's discretion in refusing such amendment could not be reviewed.

Appeal from the Circuit Court of the United States for the District of Indiana.

In April, 1900, the appellant and one Herman J. Meyer, copartners as Meyer & Bulte, filed their bill in the court below to restrain alleged infringement of a trade-mark for flour, and also to restrain unfair competition in trade. By a supplemental bill filed by Bulte as sole complainant March 4, 1901, it is stated that on July 1, 1900, Meyer transferred his interest in the business, his trade-mark and good will, to Bulte, who holds the right thereto, and to all rights of action for past infringement. The original bill charges that the complainants have from 1880 to May 1, 1897, carried on business as manufacturers of flour at St. Louis, and then moved to Clinton, and later to Kansas City, Mo., where the business is now carried on; that Philip Land originated the brand in question and established the business of manufacturing flour in the year 1865 at Brownsville, now Sweet Springs, Mo. He was succeeded by Land & Co. in 1875; the latter were succeeded by Land & Swaggard in the year 1882, who in turn were succeeded by George Swaggard & Son, in March, 1885; and they were succeeded by the Sweet Springs Milling Company in the year 1887; and that company in turn was succeeded in November, 1892, by the complainants "in the good will and trade-mark rights hereinafter specified." The bill proceeds: "And your orators now conduct and

carry on the said business of said predecessors, and are vested with all the rights of their said predecessors, all and singular, including the good will, trade-mark, brands, trade-names, etc., of said predecessors, as hereinafter specified, and your orators are in all things vested with all of said rights and interests of their predecessors in business, all and singular, and are the sole owners thereof. And from the year 1880 to the 1st day of May, 1897, were located and did business in the city of St. Louis, and later moved their offices to Clinton, and later to Kansas City, in said state of Missouri, as a copartnership under the firm name of Meyer & Bulte." The bill charges that: "Since the year 1865 their predecessors or themselves have been continuously manufacturing and selling in the markets of the United States and elsewhere a certain brand of flour of superior quality for certain uses, which has been known, identified, referred to, and called for as the 'White Swan' brand, and which has long been and now is in very great demand, and known, referred to, and distinguished by the said designation 'White Swan'; and that said flour has been manufactured during more than thirty-four years past in uniform high quality, and put up in packages, sacks, and barrels to which has been applied a circular label having thereon a circle within which is a smaller circle, and within the smaller circle is a pictorial representation of a lake or body of water, upon whose bosom is a white swan, and within the outer circle are the words 'Roller Patent Process,' and above the picture of the swan is the name of the manufacturers, and the following words and marks, to wit, 'Meyer & Bulte's,' and beneath the picture of the swan are the words 'White Swan' and the name of the location of the manufacturers' milling plant, and at the top of the label are the figures '196.'" The bill charges that Land & Swaggard registered on the 29th of April, 1884, upon application filed March 31, 1884, their trade-mark, "the essential feature of which is therein specified as the pictorial representation of a white swan upon water"; that the complainants on the 21st of November, 1899, "again caused the said trademark to be registered according to the statutes of the United States, * * * the essential feature of which is therein given as the pictorial representation of a white swan, or the words 'White Swan'"; that the trade-mark, as applied to flour, and referred to in said certificates of registration, has been used by the complainants and by their predecessors in connection with a single package, sack, or barrel of flour for many years in commercial intercourse with Indian tribes and in commerce with the United States, Canada, Mexico, and Great Britain. The bill contains the usual allegations with respect to infringement by the defendants, and prays for an injunction, etc.

On December 28, 1900, the complainants, with leave of the court, amended their bill by inserting after the allegations touching the use of the brand by their predecessors in business the following: "Your orators further say that early in the year 1880 they originated the brand hereinafter mentioned, to wit, picture of a white swan, together with the words 'White Swan,' in a manner entirely independent of any of their said predecessors, and have continuously used the same in business up to and including the date of filing the bill of complaint herein, and have always sedulously guarded their rights and interests in the same;" and also amended the bill by alleging that prior to the registration of the trade-mark by their predecessors the complainants "had already secured registration in the United States Patent Office of their label illustrating said brand, the picture of white swan and the words 'White Swan,' said registered label being numbered 3,624 and dated 23d day of October, 1883," and under date of January 22, 1884, duly registered the trademark under the statutes of the state of Missouri.

The answer denies that the complainants are the successors in business of Philip Land or his successors named. Alleges that the Sweet Springs Milling Company is the sole successor of Philip Land, carrying on the business at Sweet Springs, Mo.; that the complainants never had any interest in the milling plant owned and operated by the several persons and firms who were successors of Philip Land, but used the white swan label upon a brand of flour of their own, different in quality, made at different places, of different weight, and by different machinery; that all that they acquired from the Sweet Springs Milling Company or its predecessors was by an instrument executed November 7, 1892, by B. F. Swaggard, of the late firm of George Swaggard

& Son, Sarah Swaggard, the wife of George Swaggard, deceased. Thomas O. Berry, guardian and curator of the minor heirs of George Swaggard, deceased, Philip Land, and the Sweet Springs Milling Company, which recited that P. Land was the original appropriator of a trade-mark for flour embodying the pictorial representation of a white swan upon water, as specifically set forth and described in trade-mark No. 11,147, registered April 29, 1884, and used continuously in business by them since 1875, and grants all their right, title, and interest to the said brand and trade-mark; that Land established the milling business about the year 1871, which business was carried on by Land & Co., Land & Swaggard, and Swaggard & Co., until June 1, 1888, when the milling plant, business, and good will thereof were purchased by the Sweet Springs Milling Company, which has since owned and conducted the business, and now operates and conducts the same. The answer denies that Philip Land or the complainants at any time originated the brand of flour known as the "White Swan" brand, and denies that the pictorial representation of the white swan, or the words "White Swan," were used by Land or his successors in business, or by the complainants, prior to the year 1875; that complainants used the brand subsequently to the use thereof by Land & Co., and priority of use by them is denied; and it is alleged that other millers and manufacturers of wheat flour used the brand continuously for many years, so that it has come into general and extensive use throughout the country, independent of complainants or their use of it. The answer denies that the defendants have imitated the brand as charged; alleges that in the brand used by the defendant it employs form, detail. and ornamentation different from that used by the complainants. In the defendants' brand the picture of the white swan is fronting to the right; in that used by the complainants it is fronting to the left, and is of different form. Defendants use the words "Swans Down," with the name of their corporation and the address of their milling plant, and their flour is known to the trade as "Igleheart's Swans Down Flour"; the complainants using the words "White Swan" with their name, "Meyer & Bulte," and the name and address of their milling plant, upon the label and brand, and their flour is known as "Meyer & Bulte's White Swan Flour"; that the defendants' brand "Swans Down," with the pictorial representation of a white swan in connection therewith as a label of white flour, was originated by one McCann, of the city of Nashville, in the year 1868 or 1869, in the manufacture and sale of wheat flour, and has been continuously used by him and his successors until it came to the ownership of the Cumberland Mills in the year 1899, in which year the defendants acquired the right thereto by assignment from the Cumberland Mills. The answer also challenges the validity of the use of the white swan as a trade-mark; asserts it to be descriptive of quality and grade; asserts 30 years' general use of the label; that the failure of complainants to exhibit upon the label that they are the successors of Land & Swaggard vitiates any claim on their part to the use of the label; alleges 20 years' use by the defendants of the trade-name "Swans Down" as giving a perfect title; asserts laches upon the part of the complainants and their predecessors, and asserts other claimed defenses of which this opinion does not treat.

On March 5, 1901, the cause was referred to a master, who, in July, 1903, reported his findings of fact and conclusions of law, together with the evidence. So far as deemed material to the discussion of this case, the facts found by him are these: That the firm of Meyer & Bulte was formed in the year 1881 in the city of St. Louis to do a flour commission business. For four or five years prior thereto they had been engaged in a like business in that city with one Imbs, under the firm name of Imbs, Meyer & Co., which firm was dissolved May 31, 1881. That firm had succeeded Imbs, Meyer & Fusz, which firm had been engaged in a like business as early as 1871. Subsequently to this suit Herman Meyer sold his interest in the firm of Meyer & Bulte to August J. Bulte, but by agreement he retained an interest in the subject-matter of this suit. The firm of Imbs, Meyer & Fusz used a flour brand containing the words "White Swan," but not containing the picture of a swan bird in any form. The brand became the property of Meyer & Bulte, who, in July, 1881, began to use on their best grade of flour a brand containing

·the words "White Swan" and the picture of a swan bird floating or swimming ·on water, which brand was used continuously by them to the present time.

Igleheart Bros. was a firm doing a flour milling business at Evansville. Ind., for several years prior to 1860, and continued therein until 1887, when ·certain changes were made in the firm, and in 1892 the partnership property, business, and good will were transferred to Igleheart Bros., a corporation of Indiana, by whom the business has been conducted continuously to the present time. The firm of Igleheart Bros. in September, 1879, began the use of a flour brand containing the words "Swans Down," but not containing the picture of a swan bird in any form; which brand was used by them until a date between the years 1881 and 1884, the precise date being indeterminable upon the evidence, when they added the picture label of a swan upon water, which has since been continuously used by the defendants without material change.

Prior to 1876, persons engaged in the flour milling business or flour commission business in the states of New York, Illinois. Missouri, Iowa, Texas, and Canada used upon barrels, bags, or sacks containing flour, as a brand or descriptive badge or mark, the single word "Swan," or the word "Swan" joined with other words, making the combination "White Swan," "Swan Lake," or "Swans Down." Early in the year 1874, Eckhart & Swan, a flour commission firm of Chicago, placed upon its flour barrels by a stencil the picture of a swan floating or swimming on water.. It used this brand, which was not its leading brand, from 1874 to 1901, both in its wholesale flour commission business, which it conducted up to 1884, and its flour milling business, which it engaged in in 1884, and continued until the business was sold to the Eckhart & Swan Milling Company, which corporation used that brand up to the year 1901. Prior to 1878 they used the swan brand upon the flour in advance of sales, and after the year 1878 only when requested so to do by their patrons.

In 1878, Land & Co., at Brownsville (now Sweet Springs), Mo., began the use of a brand or descriptive badge or mark for flour containing the word "White" over the picture of a swan floating or swimming upon water. This brand was continuously used by that firm and its successors in business down to 1888, when their mill and milling business was transferred to the Sweet Springs Milling Company, which company operated the mill and continued the business and the use of the brand up to the year 1901, except that for a time prior to 1891 one McAfee, the then manager of the company, designed new flour brands and labels, and the White Swan brand was only used when such brand was called for by patrons of the company; but it was used after 1891, when Philip Land, the originator of the brand, acquired an interest in the company, and became its president and manager, and was used upon a lower ·grade of flour than the grade upon which that company used its leading flour brand and label. On April 29, 1884, Land & Swaggard procured to be registered in the Patent Office as a trade-mark to be used in the sale of flour the picture of a white swan swimming upon water and facing to the right. On October 23, ·1883, Meyer & Bulte procured to be registered in the Patent Office a flour label. The instrument deposited for the purpose of procuring registration had attached to it as a part thereof a barrel label "similar to defendants' Exhibit No. 2, except only that the words 'Registered in Patent Office in Washington July 1881,' which appear on a strip of white immediately above the black background in the center of the label in·said exhibit, were marked out with black ink." (As neither defendants' Exhibit No. 2 nor its registration are preserved in the record, no fuller description can be given.) On October 9, 1899, Meyer & Bulte caused to be deposited in the Patent Office for registration a trade-mark of which "the essential feature is a pictorial representation of a white swan, or the words 'White Swan,' as set forth in the application statement of said Meyer & Bulte, and record of the registration of said trade-mark was made on November 21st. 1899." (This application and registration does not seem to be preserved in the record, and no further illustration of it can be given.) On January 17, 1898, the defendant corporation filed in the Patent Office its application for registration of a trade-mark, of which "the essential feature is the representation of a swan floating on a body of water in which are water lilies." ·The record of certain interference proceedings in the Patent Office between Igleheart Bros. and Meyer & Bulte

was introduced, in which Meyer & Bulte claimed to be the assignees of the Land & Swaggard White Swan trade-mark.

The master further finds that the evidence does not show any genuine case of deception of a purchaser, where such purchaser was induced to buy and receive the defendants' Swans Down flour instead of the complainants' White Swan flour by reason of any similarity of defendants' Swans Down flour label or brand; that the evidence did not show that an ordinary retail purchaser of flour would be likely or liable to be so misled by any similarity of the brands; that the dissimilarity is such that an ordinary retail purchaser of flour would not be misled in taking the one brand of flour for the other; that there is nothing in the evidence showing that the defendants were guilty of any act, fraud, or unfair dealing as against the complainants or the complainants' predecessors in title, or the general public.

As conclusion of law the master found that the equities were with the defendants, and that the bill of complaint should be dismissed. Exceptions to the master's report were overruled, and on January 10, 1904, a decree passed dismissing the bill for want of equity. The decree also contained the statement that the court overrules an application of the complainants for leave to file an amended bill of complaint; but the record shows no other reference to the matter, and no copy of the proposed amendment. The complainant, Bulte, alone appealed, there being no petition for severance.

Dasey A. Jamison and Henry Lore Hopkins, for appellant.

John E. Iglehart, Edwin Taylor, and Eugene H. Iglehart, for appellees.

Before JENKINS, GROSSCUP, and BAKER, Circuit Judge.

JENKINS, Circuit Judge (after stating the facts as above). We might properly dismiss this appeal for the nonjoinder therein of Herman J. Meyer, co-complainant with August J. Bulte. The supplemental bill asserts the transfer by Meyer of all his interest in the business of Meyer & Bulte, and that Bulte is the sole party interested in the subject-matter. The master finds that Meyer still retains an interest in this suit, and the record of the transfer contains this provision:

"In view of the litigation now pending on the White Swan brand, it is specially agreed that Herman J. Meyer will assume half the cost and expense of carrying on this suit, or others that may follow, to their final end; and damages granted by the court in our favor or against us to be assumed in equal proportions by Herman J. Meyer and August J. Bulte."

This is far from showing a transfer of Meyer's interest in this litigation. He was a necessary co-complainant with Bulte. No order of the court was at any time passed dismissing Meyer as a co-complainant. He was party on the record to the proceedings, and, there being no petition for an order of severance in the taking of an appeal, we would be justified in dismissing it. Loveless v. Ransom, 46 C. C. A. 515, 107 Fed. 626. The question, however, was not raised at the bar, and we pass it with the suggestion of danger flowing from inattention to correctness in practice.

The original bill charges that Philip Land originated the brand in question. The date of such origin is stated to be the year 1865. The complainants' right to the trade-mark is derived from Philip Land and his successors in the business. It is the only claim of right stated in the original bill. The title asserted is to "the good

137 F.—32

will and trade-mark rights hereinafter specified"; but this is coupled with an allegation that they now conduct and carry on the business of their predecessors, and are vested with all their rights, including the good will, trade-mark, brands, trade-names, etc. Prior to 1897 the complainants were located in the city of St. Louis, and thereafter moved their offices to Clinton and to Kansas City. The Sweet Springs Milling Company, the ultimate successors of Philip Land in his business at Brownsville (now Sweet Springs), are still located at that place, operating the mill property and the business formerly conducted by Land. The transfer of title of November 7, 1892, recites that Land "was the original appropriator of a trade-mark for flour, breadstuff, etc., embodying the pictorial representation of a White Swan upon water, as specifically set forth and described in the trade-mark No. 11,147, and registered in the firm name of Land & Swaggard as proprietors, on the 29th day of April, 1884, and used continually in business by them since 1875"; then, pursuing the various transfers of the business down to the Sweet Springs Milling Company, recites that Meyer & Bulte "are desirous of acquiring the exclusive ownership, right, title, and use of said brand or trade-mark for said class of merchandise"; then, in the granting clause, the vendors sell, assign, and transfer to the firm of Meyer & Bulte "all their right, title, and interest to the said brand and trade-mark." The milling business of the grantors is not transferred, nor is any interest therein passed to Meyer & Bulte. It is simply the transfer of the trade-mark, independently of the business in which, as it is claimed, the trade-mark originated and was used. The question, then, arises: Is there such right of property in a trade-mark, when dissociated from the business in which it is employed, that such right can be transferred to another, and he be clothed with the exclusive right to its use at another place, in another business having no connection with the business in which the mark was originally employed, but in connection with the same class of manufacture? The function of a trade-mark is to distinguish the products of a manufacturer or the objects of commerce; to point out distinctively the origin or ownership of the article to which it is affixed; that is to say, it must of itself or by association indicate the origin or ownership of the article. A trade-mark or trade-name is of no virtue in and of itself. It becomes of value only through use, and because by use it is an assurance to purchasers of the excellence of the article to which it is affixed as manufactured by the one whose name appears as the producer. The fanciful or arbitrary trade-mark, by association with the name of the producer, becomes, therefore, valuable, because it is a sign and symbol to the purchaser, an assurance to him of the genuineness of the article and of its manufacture by the proprietor of the trade-mark or trade-name. Dissociated from such manufacture, it is not an assurance of genuineness. When used by another, its use works a fraud upon the purchaser. A trade-mark is analogous to the good will of a business. Whoever heard of a good will being sold to one while the original owner

continues the business as before? The good will is inseparable from the business itself. So, likewise, is a trade-mark or trade-name that gives assurance to a purchaser that the article upon which is stamped the trade-mark or trade-name is the genuine production of the manufacturer to whom the trade-name or trade-mark points by association as the maker of the article. Therefore it is that it is a necessary qualification to the assignability of a trade-mark that there goes with it the transfer of the business and good will of the owner of the symbol. Cotton v. Gillard, 44 L. J. Ch. 90; Croft v. Day, 7 Beav. 84; Robertson v. Quiddington, 28 Beav. 529; Singer Manufacturing Company v. Long, 8 App. Cases, 17; Gegg v. Bassett, 3 Ont. L. Rep. 263; Kidd v. Johnson, 100 U. S. 620, 25 L. Ed. 769; Brown Chemical Company v. Meyer, 139 U. S. 540, 11 Sup. Ct. 625, 35 L. Ed. 247; Chadwick v. Covell, 151 Mass. 190, 23 N. E. 1068, 6 L. R. A. 839, 21 Am. St. Rep. 442; Congress, etc., Spring Company v. High Rock Congress Spring Company, 45 N. Y. 302, 6 Am. Rep. 82. There is here no pretense of the transfer to Meyer & Bulte of the business of the originators of this trade-mark, or of their successors in business. They have continued up to this time the manufacture of flour as before. It was a bald attempt to sell the trade-mark disassociated from the business in which it had been used, and in which it had acquired its value by association with the manufacture of flour by the originator and his successors. It was subsequently used by the complainants at another place, and upon their own manufactures. To uphold such a transfer would be to ignore the fundamental office of a trade-mark, would be to disregard its purpose and object, would be to sanction a fraud upon the public purchasing the article. We are of opinion, therefore, that the complainants acquired no title to this trade-mark under the transfer from Land and his successors in business.

It is equally clear that, if the title could be upheld, the complainants would not be entitled to equitable relief, because of their omission to state the fact of transfer in connection with its use. Leather Cloth Company, Limited, v. The American Leather Cloth Company, Limited, 4 De G. J. & S. 137, 11 House of Lords' Cases, 523; Manhattan Medicine Company v. Wood, 108 U. S. 218, 223, 2 Sup. Ct. 436, 27 L. Ed. 706; Pillsbury v. Pillsbury-Washburn Flour Mills Company, 12 C. C. A. 432, 64 Fed. 841. In the case in the Supreme Court it is said, page 223 of 108 U. S., page 439 of 2 Sup. Ct. (27 L. Ed. 706):

"The object of the trade-mark being to indicate, by its meaning or association, the origin or ownership of the article, it would seem that when a right to its use is transferred to others, either by act of the original manufacturer or by operation of law, the fact of transfer should be stated in connection with its use; otherwise a deception would be practiced upon the public, and the very fraud accomplished to prevent which courts of equity interfere to protect the exclusive right of the original manufacturer. If one affix to goods of his own manufacture signs or marks which indicate that they are the manufacture of others, he is deceiving the public and attempting to pass upon them goods as possessing a quality and merit which another's skill has given to similar articles, and which his own manufacture does not possess in the estimation of purchasers."

For the reasons assigned the complainants can rightfully claim nothing under the assignment to them of this trade-mark.

By an amendment to the bill they assert that "early in the year 1880 they originated the brand hereinafter mentioned, to wit, picture of a white swan, together with the words 'White Swan' in a manner entirely independent of any of their said predecessors, and have continuously used the same in business up to and including the date of filing the bill of complaint herein." Under this amendment they claim the right to priority and exclusiveness of use. The amendment certainly puts the complainants in a peculiar position. In their original bill they assert that Land originated the trade-mark or brand in the year 1865, and the brand is described as a circular label having thereon a circle within which is a smaller circle, and within the smaller circle is a pictorial representation of a lake or body of water upon whose bosom is a white swan, and above this picture of the swan is the name of the manufacturers, beneath the picture of the swan are the words "White Swan," the name of the manufacturers, and the name of the location of the manufacturers' milling plant, and at the top of the label are the figures "196." It will be observed that in the amendment the only description of the trade-mark claimed to be originated by them is that it is the picture of a white swan arranged in a manner entirely independent of any of their predecessors. The design, within the terms of the allegation, would seem to go only to the matter of arrangement of parts, not to original appropriation of symbols. The trade-name "White Swan" is appropriated, and the picture of the bird upon the water is also appropriated. These are the two salient objects which catch the eye of the purchaser. The matter of arrangement of them is subordinate, and probably immaterial, not justifying appropriation of symbols belonging to another. So that the allegation of the amendment is nothing more than a confession that in the year 1880 they pirated the mark and brand which by prior use belonged to Land or his successors, and without justification invaded their rights and infringed their trademark.

But leaving out of view the assertions of the original bill, and construing the language of the amendment as broadly as possible in the interest of the complainants, in what plight are they left with reference to this trade-mark? We have given careful scrutiny to the great volume of evidence contained in this record, and we think the master's conclusions of fact well supported. Leaving out of consideration all doubtful evidence, it appears that the name "White Swan," but without the picture of a swan, was used in Western New York and in the country around St. Catharines, in Canada, as early as the year 1867, and continuously up to 1872 or 1873, when the witness testifying to the fact moved west from that country. It also satisfactorily appears that the firm of Eckhart & Swan, in the year 1874, sold flour with the brand "White Swan" and the picture of a swan floating or swimming on water. The history of this use is fully set forth in the third paragraph of the

master's finding, and is here quoted in full as expressive of our own views upon the testimony.

"Prior to 1876 persons engaged in the flour milling business or flour commission business in New York, Illinois, Missouri, Iowa, Texas, and Canada used upon barrels, bags, or sacks containing flour, as a brand or descriptive badge or mark, the single word 'Swan' or the word 'Swan' joined with other words, making the combination 'White Swan,' 'Swan Lake,' or 'Swans Down.' Early in the year 1874 a flour commission firm in the city of Chicago, Illinois, placed upon its flour barrels by a stencil the picture of a swan (bird) floating or swimming on water. The name of the Chicago firm was Eckhart & Swan. This 'Swan' brand of flour was never its leading brand, but it used that brand from 1874 down to 1901, both in its wholesale flour commission business, which it conducted up to 1884, and in its flour milling business, which it engaged in in the year 1884, and which it continued until the partnership sold its property and business to a corporation of the name of Eckhart & Swan Milling Company, and that corporation used that brand down to 1901. Down to 1878 said Eckhart & Swan used said Swan brand containing the bird picture upon flour sold by them. Subsequently, and down to a time after the filing of the bill of complaint herein, the partnership and its above-named successor corporation used the same brand upon flour purchased from the firm or corporation; that is to say, before 1878 they used the Swan brand upon flour in advance of the sales by that brand, and after the first of the year 1878 they used the Swan brand upon flour when they were asked to do so by their patrons."

It would serve no useful purpose to discuss at length the testimony in this case. It clearly and certainly appears that prior to the appropriation of the trade-mark containing the words "White Swan" and the picture of a swan floating upon water by the complainants in 1880, and for at least 15 years prior thereto, the words "White Swan" had been quite generally used, and the picture of a swan floating upon water had been adopted and used by at least two firms, Eckhart & Swan and Land and his successors. So that there can be no justification for the pretension that the complainants originated this brand. They undoubtedly changed the arrangements of the marks and the picture, but that gave them no right to the exclusive use of the picture or the marks or the name as a trade-mark.

This conclusion brings us to the consideration of the question of unfair trade—whether the defendants have disguised their goods, so imitating the marks of the complainants, that they are liable to be palmed off upon the public as and for the goods of the complainants. We cannot doubt that the words "White Swan" had for many years been quite generally used as a brand of flour. We need not consider the question whether that term has come to indicate the quality of flour rather than point to its origin. But that name and the names "Swan Lake" and "Swans Down" and other like terms had for many years been quite generally employed as a brand for flour. The defendants' brand is "Swans Down." Both brands are circular in form—a form quite common in respect to brands of flour. The outer circle of each is in blue, but of different design; that of the defendants being a representation of heads of wheat, that of the complainants a fancy border. The principal background of the outer circle of the complainants' brand is dark red, with the words "Patent Process" in the center and on either

side of the inner circle in white letters upon blue; the complainants' name being printed in white upon the red background above the inner circle, and the words "White Swan" in white below the inner circle. Above the entire circle is printed, "48 lbs. Flour" in blue letters upon white background. In the inner circle, is the picture of a swan facing the left, floating upon water, the background being purple, and above the swan the word "Roller" in white letters. Below the entire picture are the words "White Swan" "Best Patent." The defendants' outer circle has a background of pink or rose color, the space above and below the inner circle being occupied by the names in white, "Igleheart Brothers. Roller Patent. Evansville, Indiana," and picture of two small swans facing in opposite directions. There are two inner circles, the outer one of which is of blue background with the words "Swans Down" in white letters, a name employed by them as a trade-mark as early as 1879. The inner one has a greenish background representing foliage, a fence in white, and a swan floating upon water, facing to the right. Below the entire circle is printed in blue, "48 lbs. Iglehart's Swans Down."

Starting with the predicate that the defendants had no exclusive right either to the name "White Swan" or to the picture of a swan, we perceive, upon a comparison of these brands, nothing to indicate a design to confuse, and nothing that would be apt to deceive a purchaser using the ordinary care of purchasers into mistaking the one for the other. As before remarked, the term "White Swan" and the picture of a white swan floating upon water are the salient features of the trade-mark asserted. These are things which catch the eye and abide in the memory. A certain similarity in form and contour may be observable, but that is common to innumerable brands of flour. In some respects an acute observer using extraordinary inspection might discern features common to both. So he could in any two brands of flour. But flour is purchased, by the retailer at least, by the name of the brand, or of the symbol which indicates by association the origin or manufacture. As, therefore, the complainants had no exclusive right to the symbol or to the name, and as not a single instance of imposition or mistake is shown, we are satisfied that the conclusion of the master is correct that the dissimilarity between the brands is such that an ordinary retail purchaser of flour would not be misled.

At the hearing upon the master's report, as indicated by the testimony, an application was made for permission to file an amended bill, which permission was refused. This is asserted for error. The contention cannot be sustained. The matter of amendment rests largely, if not wholly, in the discretion of the trial court. Any abuse of that discretion must be made plain to authorize an appellate court to inquire into the matter (United States v. Atherton, 102 U. S. 372, 375, 26 L. Ed. 213), and especially so where the cause has advanced to a hearing (Neale v. Neale, 9 Wall. 1, 9, 19 L. Ed. 590). The presumption is that the ruling of the court below was correct. An abuse of the discretion must be clear. The rec-

ord here exhibits neither the ground upon which the application was made nor the amendment which is proposed, so that we are wholly at a loss to judge concerning the exercise of discretion.

The decree is affirmed.