LAYTON PURE FOOD CO. v. CHURCH & DWIGHT CO.

(Circuit Court of Appeals, Eighth Circuit. September 19, 1910.)

No. 3,347.

*(Syllabus by the Court.)*

1. TRADE-MARKS AND TRADE-NAMES (§ 25½,* New vol. 6, Key No. Series)—MANUFACTURER OR DEALER NOT LIMITED TO A SINGLE MARK.

A manufacturer or dealer may secure the right to be protected in the exclusive use of as many separate trade-marks as he first adopts and then so continuously uses that they clearly become to purchasers and those who intend to purchase distinguishing marks of the origin and character of the goods he makes or sells.

2. TRADE-MARKS AND TRADE-NAMES (§ 84*) — PREVIOUS INFRINGEMENT BY OTHERS WHO HAVE CEASED NO DEFENSE.

It is no defense for a continuing infringer that others who had renounced their claim or right to use the trade-mark or have conveyed it to the complainant formerly infringed the right of its owner.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Dec. Dig. § 84.*]

3. TRADE-MARKS AND TRADE-NAMES (§ 32*)—ACCESSORY WORDS AND SYMBOLS DO NOT DESTROY.

It is the province and right of the owner and not of the infringer of a trade-mark to select and adopt it, and the fact that he uses with it

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

other symbols or words which he does not adopt as a part of that trade-mark does not deprive him of the right to it.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Dec. Dig. § 32.*]

**4. TRADE-MARKS AND TRADE-NAMES (§ 84*)—PRIOR USE BY ANOTHER ABANDONED BEFORE INFRINGEMENT NO DEFENSE.**

It is no defense to a continuing infringement of a trade-mark that previous to the infringement a third party claimed or acquired the exclusive right to use the trade-mark which he abandoned by nonuser, or by assignment without his business or its good will, years before the present infringement.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Dec. Dig. § 84.*]

**5. TRADE-MARKS AND TRADE-NAMES (§ 35*)—CLEAN HANDS—NOTICE OF ASSIGNMENT WHEN NECESSARY.**

When the chief effect of an assigned trade-mark is to point out by name the original manufacturer of the article and the original place of its manufacture, courts refuse relief to the assign who uses such a trade-mark upon goods made by himself at a different place without giving notice of the assignment, under the rule that "he who comes into equity must come with clean hands."

But when the assigned trade-mark has been so long and favorably associated with the goods to which it was affixed before the assignment that it had come to indicate their superior quality or character as completely as their manufacturer or place of manufacture, and the assign affixes it to goods of a like character so that it works no actual deception, a court of equity will not fail to protect him in the exclusive use of it, although he gives no notice of the assignment.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 39, 40; Dec. Dig. § 35.*]

**6. TRADE-MARKS AND TRADE-NAMES (§ 86*)—LACHES NOT CHARGEABLE BEFORE NOTICE OF INFRINGEMENT.**

The owner of a trade-mark is not chargeable with laches for a failure to prosecute an infringer before he knows or has such notice as would lead an ordinarily prudent person to inquire and learn the existence of the infringement. It is not his duty to search out and discover it because the presumption is that parties will abide by the law and respect his rights.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 95; Dec. Dig. § 86.*]

**7. TRADE-MARKS AND TRADE-NAMES (§ 65*)—INFRINGEMENT—TEST.**

The test of the infringement of a trade-mark is the affirmative answer to the question: Is the device used by the defendant likely or calculated to induce purchasers using such care as buyers ordinarily exercise to purchase the articles to which it is affixed in the belief that they are the articles made or sold by the owner of the trade-mark?

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 64; Dec. Dig. § 65.*

For other definitions, see Words and Phrases, vol. 4, pp. 3590–3594.]

**8. TRADE-MARKS AND TRADE-NAMES (§ 97*) — TECHNICAL TRADE-MARK—INJUNCTION AGAINST INFRINGEMENT—INTENT AND DAMAGE IMMATERIAL.**

Infringement of a common-law or technical trade-mark is a continuing trespass upon the property of its owner, and he is entitled to an injunction to suppress it whether the infringement was or is intentional or not, and whether it was or is injurious or not. Intent and damage are immaterial.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Dec. Dig. § 97.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

9. TRADE-MARKS AND TRADE-NAMES (§ 93*) — INFRINGEMENT — EVIDENCE OF THE EYES.

In determining the question of the infringement of a trade-mark the evidence of the eyes is more persuasive and satisfactory than any other.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Dec. Dig. § 93.*]

Appeal from the Circuit Court of the United States for the Eastern District of Missouri.

Action by the Church & Dwight Company against the Layton Pure Food Company. Decree for complainant, and defendant appeals. Affirmed.

See, also, 182 Fed. 35.

E. E. Huffman and A. C. Fowler, for appellant.

Paul Bakewell and Luke E. Hart (Brown & Seward, on the brief), for appellee.

Before SANBORN and VAN DEVANTER, Circuit Judges.

SANBORN, Circuit Judge. This is an appeal from a decree which enjoins the Layton Pure Food Company, a corporation, the defendant below, from infringing the trade-mark of the Church & Dwight Company, which consists of the picture of an annular band colored in gilt, red, blue, or any other color. In their pleadings and evidence both parties conceded that such a band was the proper subject of a trade-mark, and the disputed questions relate to title and infringement. The complainant is a corporation which succeeded in 1896 to the property, business, good will, and trade-marks of John Dwight & Co. and Church & Co., two partnerships that had long been engaged in the business of manufacturing and selling baking soda, saleratus, and baking powder. In 1876 John Dwight & Co. commenced to use, and thereafter continuously used until they were succeeded by the complainant, the picture of the annular band in various colors upon its packages of baking soda and baking powder to indicate their origin and their manufacturers. In 1879 Church & Co. commenced to use, and continuously thereafter used until they were succeeded by the complainant, a like picture of the annular band on their packages of baking soda and baking powder for the same purpose. The members of these two partnerships were relatives. They all became stockholders of the complainant in 1896 when it was organized, and since its organization it has used this annular band upon some of its packages to indicate the origin, the manufacturer, and the character of its baking soda and baking powder.

The defendant was incorporated in 1901. It succeeded to the business and property of the Pure Food Company, a partnership, engaged in the manufacture and sale of baking soda. That partnership in 1897 placed a picture of an annular band around the word "Quick" upon their labels, and this band has been used since that time by them and by their successor, the defendant, in connection with other words and pictorial representations upon some of the packages containing their baking soda.

On October 30, 1900, the complainant registered the picture of this annular band as its trade-mark, No. 35,359, and claimed in its declaration that it and its predecessors had used it as such since 1869. It subsequently registered this band in specific colors as its trade-mark on January 8, 1907, No. 59,574; on January 15, 1907, No. 59,817; on February 5, 1907, No. 60,407; and on August 21, 1906, No. 55,665. The defendant never registered this band as its trade-mark. The picture of this annular band was not used alone upon any of the packages of the complainant, of its predecessors in interest or of the defendant. On the other hand, it was used in association with the names of the respective manufacturers and with other words and symbols which they imprinted upon the packages containing their products. Thus in 1876 John Dwight & Co. registered "the representation of a cow" No. 3,884 as a "distinguishing mark for our baking soda, saleratus, and baking powder." In the facsimile of the label which accompanies the declaration the picture of the cow appears inclosed in an annular band upon which are printed the words "John Dwight & Company, Soda." On May 5, 1896, John Dwight & Co. registered the words "Cow Brand" as their trade-mark, No. 28,224, and stated in their declaration that these words "generally have been arranged as shown in the accompanying facsimile, in which it appears with the pictorial representation of a cow on a circular border inclosing such pictorial representation; but the latter and its border may be altered or omitted without materially altering the character of our trade-mark, the essential feature of which is the name 'Cow Brand.'" On January 26, 1897, the complainant registered the representation of an arm and hammer, No. 29,518, and declared that this trade-mark had "generally been arranged as shown in the accompanying drawing," where it appeared inclosed in an annular band on which were printed the words "Church & Co.'s Soda," but that, "the words used in connection with the trade-mark may be changed, or omitted, or arranged in different ways without materially altering the character of said trade-mark the essential feature of which is the representation of an arm and hammer." On March 28, 1899, No. 32,643, it registered the representation of a sleighing party; on March 28, 1899, No. 32,644, the picture of a bull dog's head; on February 26, 1901, No. 35,962, the picture of the moon's disk partly covering the sun's disk; on April 23, 1901, No. 36,290, the representation of a circle cut by a triangle; and on November 27, 1906, No. 57,849, the representation of a hand pointing to a star and above it the word "Zenith."

The first contention of counsel for the defendant is that one may have but a single trade-mark, and that as John Dwight & Co. registered as their trade-mark the picture of a cow in 1876, and the complainant in 1896 registered the representation of an arm and hammer, they thereby abandoned the picture of the annular band which appears in the drawings accompanying their declarations in the two registrations just recited, and the predecessors of the defendant were therefore free to appropriate that band in 1897, when they placed it upon their packages. But in 1897, when the defendant first used it,

the complainant and its predecessors in interest had been using it to mark the origin of their products for more than 20 years. The complainant had succeeded to all the rights of its predecessors and by its continued use had acquired the right to continue the use of this band to indicate both the origin and the character of the articles to which it was applied, and this right had become valuable property. Did John Dwight & Co., or the complainant, lose this property because they also adopted and registered other trade-marks for some of their manufactures? To sustain an affirmative answer to this question counsel cite Pittsburgh Crushed Steel Co. v. Diamond Steel Co. (C. C.) 85 Fed. 637, 638; but the question here in issue was not presented for decision by the pleadings and claims of the parties in that case, and the remark regarding it was casual rather than authoritative. Richter v. Anchor Remedy Co. (C. C.) 52 Fed. 455, 458. But that case is not in point because the complainant had not acquired, as had the Church & Dwight Company in this suit, a common-law right to the exclusive use of the trade-mark in controversy as against the defendant before the latter commenced to use it. Richter v. Reynolds, 59 Fed. 577, at page 579, 8 C. C. A. 220, 222; Albany Perforated Wrapping Paper Co. v. John Hoberg Co. (C. C.) 102 Fed. 157. But while there is no doubt that one cannot sustain claims to numerous trade-marks for a single article when these marks tend to produce confusion in the trade and fail to denote origin, or fail to distinguish the goods he manufactures or sells from those made or sold by others, we are not persuaded by these authorities that claims for several trade-marks are fatal to those whose adoption and use fairly accomplish the purpose of their existence and clearly distinguish articles made or sold by the claimant from those of other manufacturers or dealers. The right to the exclusive use of a trade-mark is not gained or lost by claim or by registration. It is acquired by adoption and by a use so persistent and continuous that it comes to distinguish in the eyes and thought of purchasers and of those who seek to purchase the goods of its owner from those of other makers and sellers. When it has been thus acquired it may be lost by a failure to continue its use by conveyance or by renunciation. It is not dependent upon the national statute which authorizes a registration of trade-marks. It is a right secured under and protected by the common law. And there is no principle or rule of that law, or of the federal statutes, which limits the right of a manufacturer or of a merchant to a single trade-mark, either for one or for many classes of articles. That right is limited only by the requisite adoption and use of suitable symbols. The pictorial representation of a cow, the words "Cow Brand," the pictorial representation of an arm and hammer, may be effective as trade-marks without, and they neither suggest nor require, the picture of an annular band to make them effective. Nor are any of those words or representations requisite to the efficiency of the picture of the annular band as a trade-mark. Each is distinct, complete, and effective in itself, and the fact that the complainant registered one or more of these representations as its trade-marks did not necessarily work an abandonment of the others, nor did it deprive the complainant of its right

to be protected in their use. A manufacturer or merchant may secure the right to be protected in the exclusive use of as many separate trademarks as he adopts and so uses that they become to purchasers and those who intend to purchase distinguishing marks of the goods he makes or sells. Enoch Morgan's Sons Co. v. Ward, 152 Fed. 690, 692, 693, 81 C. C. A. 616, 618, 619, 12 L. R. A. (N. S.) 729; Capewell Horse Nail Co. v. Mooney, 167 Fed. 575, 587, 588; Id., 172 Fed. 826, 97 C. C. A. 248; Saxlehner v. Eisner & Mendelson Co., 179 U. S. 19, 32, 33, 21 Sup. Ct. 7, 45 L. Ed. 60.

Counsel insist that the complainant can maintain no right to the exclusive use of the annular band as a trade-mark because it and its predecessors always used it in association with words, such as "John Dwight & Co.," and with pictures, such as that of a cow, or an arm or hammer, upon their labels and never alone. But there is no rule of law and no reason that makes the use of a trade-mark alone upon the labels or packages that present the goods of a manufacturer or dealer indispensable to its existence. Such a rule would greatly diminish, if not destroy, the value of all trade-marks. It is the province and right of the owner, and not of the infringer, of a trade-mark to determine what shall constitute his trade-mark, and his first adoption and continued use of it perfects his title to it. Nor does he lose his right to the exclusive use of the mark he selects and adopts by placing on the label or package with it other words and symbols to assist in presenting and selling the goods he makes or offers for sale. The complainant in its declaration for registration of the annular band clearly stated that the lettering and symbols commonly used by it with the picture of the band might "be changed or omitted at pleasure without materially altering the character of the said trade-mark the essential feature of which is the annular band." The fact that the owner of a trade-mark uses in association with it accessory symbols or words does not deprive him of the right to it. Walter Baker & Co. v. Delapenha (C. C.) 160 Fed. 746, 750; Bass, Ratcliff & Gretton v. Feigenspan (C. C.) 96 Fed. 206, 212; Walter Baker & Co. v. Puritan Pure Food Co. (C. C.) 139 Fed. 680, 682.

Prior to the organization of their successor, the complainants, John Dwight & Co. and Church & Co., were competitors in business, and from 1879 to 1896 they were both using the annular band as a trademark. It is said that they both lost the right to the exclusive use of this trade-mark because neither suppressed its use by the other. The suggestion, however, is not persuasive because the defendant did not commence the use of this band until after the claims of the two partnerships to it as a trade-mark with their good will and business had been conveyed to the complainant and the latter had adopted and used this trade-mark as its own. John Dwight & Co. undoubtedly had the right after 1876, under the evidence in this case, as against the defendant, to be protected in their exclusive right to this trade-mark. That right passed to the complainant, and the complainant itself, before the defendant commenced to use it, also secured a like right by its own adoption and use of the band. That right may not be destroyed or weakened by the fact that another whose claims to it were

also conveyed to the complainant before the infringement by the defendant had previously infringed the right of John Dwight & Co.

George F. Gantz, a member of the partnership styled George F. Gantz & Co., on May 14, 1872, registered a trade-mark for baking powder, No. 813, consisting, as he declared, "of the words 'Gantz Sea Foam' used in connection with" more than a dozen emblems and devices which he described, one of which was a double circle. George F. Gantz & Co. used this trade-mark from 1869 until 1877, when they were succeeded by Gantz, Jones & Co., and the latter partnership used it until 1890, when a receiver of their property was appointed who sold and conveyed this trade-mark apart from the business and property of the firm to one Archibald, from whom it came on August 7, 1899, through several mesne assignments, to the Sea Foam Baking Powder Company, and on August 29, 1900, that company sold and assigned to the complainant its right and title to that feature of this trade-mark which consisted of an annular band. The defendant pleaded in its answer that George F. Gantz, and his successors, were the owners of the sole and exclusive right to use this annular band or ring in any color as a trade-mark for baking powder and soda, and its counsel argue that this trade-mark of Gantz is fatal to the exclusive right of the complainant. But Gantz, Jones & Co. retired from business and ceased to use the trade-mark originally acquired by Gantz, or any part of it, in 1890. It was not used again so far as the record shows until 1899, and then the assignee of it renounced its claim to the annular band in favor of the complainant. The cessation of the use of this trade-mark in 1891 for a period of eight years and the due assignment of it by the receiver separate from any manufacturing or trading business, or good will, was a conclusive abandonment and destruction of the exclusive right to the use of it (Kidd v. Johnson, 100 U. S. 617, 620, 25 L. Ed. 769; Bulte v. Igleheart Bros., 137 Fed. 492, 70 C. C. A. 76; Eiseman v. Schiffer [C. C.] 157 Fed. 473), and the result was that as against the defendant the exclusive right to the use of the annular band which John Dwight & Co. and Church & Co. held during this intervening time vested in their successor, the complainant, in 1896 by their assignment of their property and good will and by the complainant's immediate adoption and continuous use of it.

Another contention of counsel for the defendant is that the complainant does not come into court with clean hands, and that it is therefore entitled to no relief because John Dwight & Co. and Church & Co. infringed the trade-mark of Gantz, Jones & Co. and because the complainant placed upon some of its packages the name of John Dwight & Co. instead of its own. If John Dwight & Co. and Church & Co. infringed the rights of Gantz, Jones & Co., it was at least five years before the complainant was incorporated, the rights of Gantz, Jones & Co. to their trade-mark had vanished by its separation from their business and good will five years before the complainant adopted and used the annular band, the complainant was never guilty of any infringement of the rights of any one, and the sins of its predecessors may not be charged to its account.

We turn to the charge that the complainant is guilty of such iniquity as repels it from a court of equity. A court of chancery prevents infringement of a trade-mark because continuing sales of the product of one manufacturer or merchant under the distinguishing symbol of another deceives and defrauds purchasers and deprives the latter of his property in his trade-mark without any adequate remedy at law. When the principal effect of the assigned trade-mark is to point out the original manufacturer of the article by name and the original place of its manufacture, assigns who affix such a trade-mark to articles made by themselves and not by the original manufacturer at a different place from that specified on their label without giving to purchasers any notice of the assignment, or of the change of manufacturers and place of manufacture, may thereby deceive purchasers and work a fraud upon them similar to that wrought by the infringement of a trade-mark. Thus in Manhattan Medicine Co. v. Wood, 108 U. S. 218, 222, 2 Sup. Ct. 436, 27 L. Ed. 706, a medicine had been originally made at Georgetown, Mass., by Dr. Moses Atwood, had been designated "Atwood's Vegetable Physical Jaundice Bitters," and had been accompanied with the declaration of the label that it was made at Georgetown, Mass. The complainant by various mesne conveyances acquired the formula, the business, and the trade-mark, and was making this medicine in New York City and selling it under the designation "Atwood's Genuine Physical Jaundice Bitters, Georgetown, Mass." It was representing that its product was made by Atwood at Georgetown when it was made by itself in New York. In cases of this character courts have refused relief to such assigns on account of the deception they were practicing under the rule "he who comes into equity must do so with clean hands." Leather Cloth Co. (Limited) v. American Leather Cloth Co. (Limited), 4 De Gex, Jones & Smith's Rep. 137, 11 House of Lords Cases; Stachelberg v. Ponce (C. C.) 23 Fed. 430; Symonds v. Jones, 82 Me. 302, 19 Atl. 820, 823, 8 L. R. A. 570, 17 Am. St. Rep. 485. But when the assigned trade-mark has been associated so long and favorably with the goods to which it was affixed before the assignment that it had come to indicate to purchasers the superior character and quality of the goods as completely as it designated their makers or their places of manufacture, and the assign or successor in interest affixes it to goods of a like character and quality so that it works no real deception, a court of equity will not fail to protect him in the exclusive use of it, although he gives no notice of the assignment or change of manufacturers. Menendez v. Holt, 128 U. S. 514, 520, 9 Sup. Ct. 143, 32 L. Ed. 526; Société Anonyme, etc., v. Western Distilling Co. (C. C.) 43 Fed. 416, 418; Pillsbury v. Pillsbury-Washburn Flour Mills Co., 64 Fed. 841, 850, 12 C. C. A. 432, 439; Feder v. Benkert, 70 Fed. 613, 617, 18 C. C. A. 549, 553; Cuervo v. Landauer (C. C.) 63 Fed. 1003; Tarrant & Co. v. Johann Hoff, 76 Fed. 959, 961, 22 C. C. A. 644, 646; Hoxie v. Chaney, 143 Mass. 592, 10 N. E. 713, 58 Am. Rep. 149, 26 Amer. & Eng. Encycl. of Law (1st Ed.) 260.

The case in hand falls under the latter rule. The annular band had by long use by John Dwight & Co. come to indicate not only

origin, but very clearly the quality of the baking soda and baking powder which they made and sold. The complainant is the successor in interest of both John Dwight & Co. and Church & Co., all the members of those firms were relatives, and when it was formed they all became its stockholders. In everything except legal form it was John Dwight & Co. and Church & Co. John Dwight was its first president. When it was formed it succeeded to the ownership of many labels on which the name John Dwight & Co. was printed. Now the head and front of its alleged offending is that it has continued to use the name of John Dwight & Co. on some of its packages of baking soda and baking powder although John Dwight died several years before the bill in this suit was filed, although the factory of John Dwight & Co. in New York City has long since been dismantled and the complainant's products have been made at Solvay, near Syracuse in New York. There is, however, no evidence that the articles to which the name of John Dwight & Co. was affixed by complainant were not made in the same way, or that they were not of the same character as those formerly manufactured by that partnership. Succeeding, as it did, to the property, business, and good will and the trade-marks of John Dwight & Co., not by purchase, but by mere change of form of the legal entity which held them, it had the undoubted right to the full benefit of the use of the name of John Dwight & Co. to enable it to sell its products and to secure the benefit of the good will of their business. There was no fraud or deception in its use, no iniquity to repel it from a court of equity, and the defendant cannot evade the issue of infringement upon this ground. Moreover, it did not plead and the complainant had no opportunity to answer or to produce evidence upon this charge, and it is here dismissed with the remark that, even if there was some evidence to sustain it, this court would hesitate long to reverse the final decree of the court below on the ground that this defense was sustained in the absence of any pleading or issue concerning it.

The next reason urged by counsel for the defendant why the decree for the injunction and accounting were erroneous is that the complainant was guilty of fatal laches. Laches is of the nature of estoppel. It rests on the principle that a court of equity will not move to enforce one's rights who has knowingly delayed to enforce them so long that the defendant in reliance upon the owner's acquiescence in his violation of them has made such investments and so changed his position that it would be more inequitable to enforce the owner's rights than to leave them in the state in which he has been content to permit them to be for an unreasonable length of time. In other words, the basis of laches is the absence of reasonable diligence in commencing a suit and a situation of the defendant induced by that absence which renders it inequitable to enforce the right of the complainant. The Church & Dwight Company had the undoubted right to the exclusive use of this annular band as a trade-mark upon baking soda and baking powder after 1896. The legal presumption was that other manufacturers and dealers would respect that right. Upon that presumption the complainant had the right to rely, and its failure to

search out and discover infringements constituted no lack of reasonable diligence. The limit of its duty was to use diligence to enforce its right against those who it knew or had notice were infringing. There is evidence in the record in hand that the defendant has been using this annular band on some of its packages since 1897, but it has not used it on all of them. It has been and is engaged in business in St. Louis in the state of Missouri, while the manufactory and place of business of the complainant was and is in Solvay near Syracuse in the state of New York. It is not probable that the complainant or its agents saw many of the packages which the defendant made and sold. There is evidence that in the year 1898 there was correspondence between these parties in relation to the use by the defendant of the picture of a cow as a trade-mark, but no reference was made in that correspondence to the trade-mark consisting of the annular band, and no evidence has been discovered in the record that the complainant knew or had any notice which pursued with reasonable diligence would have led it to know prior to March, 1907, that the defendant was infringing upon its exclusive right to the use of that band as a trade-mark. On the other hand, one of the employés and chief witnesses for the complainant, whose evidence discloses familiarity with its trade-marks and their infringement, testified that he never learned of the complainant's use of this annular band until the year 1907, and the bill was filed in June of that year. The owner of a trade-mark is not chargeable with laches for failure to prosecute an infringer before he knows or has such notice as would lead an ordinarily prudent person to inquire and learn the existence of the infringement. Sawyer v. Kellogg (C. C.) 9 Fed. 601, 602; Kilbourn v. Sunderland, 130 U. S. 518, 9 Sup. Ct. 594, 32 L. Ed. 1005. There was no evidence of any lack of diligence in the commencement of this suit and the defense of laches cannot be sustained either against the complainant's claim for the accounting or its claim for the injunction.

Finally, counsel for the defendant contend that their client has not infringed the right of the complainant. They concede that it has used on its packages the annular band, but contend that because it placed within it the picture, sometimes of a rose, sometimes of a bird, and sometimes the printed word "Quick," none of which appeared on complainant's packages, because it used colors that differed from those used by the complainant and because it placed above and below the picture of the annular band words such as "Red Rose Soda," "Layton Soda," and others of like character which were not used by the complainant, it succeeded in so differentiating the dress of its goods from that of the goods of the complainant that it escaped infringement. They call attention to the fact that there is no testimony that the defendant ever intended to deceive any one into the belief that its goods were those of the complainant and none that any purchaser ever was deceived. But this cause is based solely on the complainant's ownership of a common-law or technical trade-mark. If the defendant infringes the right to that trade-mark, which is valuable property of the complainant, if it trespasses upon that property, the complainant is entitled to an injunction against the continuance of that infringement,

whether its infringement was or is intentional or not. and whether the trespass upon the complainant's property was or is injurious or not. Intent and damage are immaterial here. Hutchinson, Pierce & Co. v.' Loewy, 163 Fed. 42, 90 C. C. A. 1; Lawrence Manufacturing Co. v. Tennessee Manufacturing Co., 138 U. S. 537, 11 Sup. Ct. 396, 34 L. Ed. .997; Gannert v. Rupert, 127 Fed. 962, 62 C. C. A. 594.

The complainant has the right to the exclusive use of its annular band upon its packages of baking soda and baking powder for the purpose of distinguishing the origin and character of its products from those of all other manufacturers and dealers, and any one who affixes that trademark to similar articles in such a way that his use of it is liable to cause confusion in the trade, or is calculated to mislead purchasers and induce them to buy his articles as the goods of the complainant, deprives the latter of the full benefit of its property and becomes an infringer. The use of any simulation of a trade-mark which is likely to induce common purchasers, exercising ordinary care, to buy the article to which it is affixed as the product of the owner of the trade-mark, is an infringement of the owner's right and entitles him to equitable relief. McLean v. Fleming, 96 U. S. 245, 251, 24 L. Ed. 828; Kann v. Diamond Steel Co., 89 Fed. 706, 711, 32 C. C. A. 324, 329; Walter Baker & Co. v. Puritan Pure Food Co. (C. C.) 139 Fed. 680, 682. So the final question is: Is the use by the defendant on its packages of baking soda or of baking powder of the annular band calculated to induce purchasers exercising such care as buyers ordinarily exercise to purchase the articles offered under it in the belief that they are articles made or sold by the complainant? The chancellor below answered this question in the affirmative. The defendant itself at an earlier stage in this case was of the opinion that such a use might be an infringement, for it pleaded that Gantz and his successors had the exclusive right to the use of this annular band as a trade-mark and that the use of it by the complainant and its predecessors on their packages was an infringement of that right. The packages of the complainant and those of the defendant are before us. A description or reproduction of them would not aid in the determination of subsequent cases. The labels of the defendant are by no means identical with those of the complainant. They differ in their colors, in the devices within the annular bands, and in the names and words upon the packages. But the annular bands constitute a striking feature of the labels of the defendant. The evidence of the eyes is more persuasive and satisfactory than any other. Liggett, etc., Tobacco Co. v. Finzer, 128 U. S. 182, 184, .9 Sup. Ct. 60, 32 L. Ed. 395; P. Lorillard Co. v. Peper, 86 Fed. 956, 960, 30 C. C. A. 496, 500; Von Mumm v. Frash (C. C.) 56 Fed. 830, 837. And when the eyes are turned upon these labels the ocular demonstration is complete that the annular bands upon them give to those of the defendant a marked similarity to those of the complainant, a similarity so plain that it renders them well calculated to create confusion in the trade and to deceive buyers into the purchase of the products of the defendant in the belief that they are those of the complainant.

The decree below must, accordingly, be affirmed, and it is so ordered.