## WILSON v. COLORADO MINING CO.

### WILSON et al. v. SAME.

(Circuit Court of Appeals, Eighth Circuit.   September 27, 1915.)

### Nos. 4430, 4431.

#### (Syllabus by the Court.)

1. CORPORATIONS ⬦93—UNAUTHORIZED ASSESSMENT—LIABILITY OF CORPORA-
TION—DEFENSE.

A corporation which, without lawful authority, assesses and thereby appropriates to itself stock in it, or a valuable interest in such stock, of which it is aware another is owner, thereby becomes liable at the option of the owner to restore to him the stock, or the interest therein and the dividends thereon, or to pay the damages caused by the taking, and the corporation's ignorance of the law or belief in its right to commit the wrong is no defense to the liability.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 380, 390–402; Dec. Dig. ⬦93.]

2. ABANDONMENT · ⬦5—CORPORATIONS ⬦93—INTENT—PRESUMPTION—COR-
PORATE STOCK.

The test of abandonment of property or of a right of action is the intent to abandon. The presumption is that an owner of property, or of the right to it, did not intend to abandon it, and the burden to prove the contrary is on him who asserts it.

A corporation, with full knowledge that W. was the pledgor of stock, the certificates of which to the pledgees were in the possession of its secretary, made an unauthorized assessment upon and sale of it to itself in the summer of 1900. W. had no knowledge or notice thereof until the fall of 1906, and he brought suit for it in September, 1908.

Held, that he did not abandon his interest in the stock or his right to recover of the company for its appropriation.

[Ed. Note.—For other cases, see Abandonment, Cent. Dig. §§ 7–9; Dec. Dig. ⬦5; Corporations, Cent. Dig. §§ 380, 390–402; Dec. Dig. ⬦93.]

3. EQUITY ⬦72—LACHES—CHANGE OF VALUE.

Where a suit in equity is brought against a wrongdoer for the misappropriation of property within the time limited for the analogous action at law, mere delay and an increase in the value of the property, unaccompanied by the intervention of the rights of innocent parties, the death of important witnesses, the loss of documentary evidence, or other similar circumstances, will not constitute fatal laches.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 207, 210–220, 225, 226; Dec. Dig. ⬦72.]

4. CORPORATIONS ⬦123—LACHES—MISAPPROPRIATION OF PLEDGED PROPERTY.

An unauthorized appropriation to itself by a corporation of collateral securities, with full knowledge of the interest of the pledgor therein, although with the voluntary transfer, or consent, or acquiescence, or negligence, or laches of the pledgee, is both a tort and a breach of trust, and the pledgor may maintain, at his option, a suit in equity for their recovery, or an action at law for the value of his interest therein. The laches of the pledgee is no bar to the right of action of a pledgor who has been guilty of no laches.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 481, 491, 507–512, 537, 539–546, 569, 618; Dec. Dig. ⬦123.]

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

5. JUDGMENT ⊕⇒599—SPLITTING CAUSE OF ACTION—SUBSEQUENTLY DISCOVERED CLAIMS.

It is a general rule that one may not split his cause of action. He who avails himself by action or defense and judgment of a part of an entire indivisible claim or cause of action thereby estops himself from maintaining an action or defense founded upon any other part of it.

But claims that were a part of the indivisible claim or cause of action, but were unknown during the pendency of the first suit to the party who used other parts of the entire claim therein, are excepted from this rule, and an action or defense may be maintained upon them after judgment in the first action.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 1114; Dec. Dig. ⊕⇒599.]

6. CORPORATIONS ⊕⇒93—UNAUTHORIZED APPROPRIATION OF CORPORATE STOCK —REMEDIES OF STOCKHOLDER.

Where, without authority so to do, a corporation has appropriated to itself, or transferred to another, the stock of one of its stockholders, he is entitled in a proper suit to a decree that the company record in his name and issue to him a like amount of stock, and that, if necessary to accomplish this end, the company acquire by purchase and transfer to him the requisite amount of stock, and that, if the corporation fails to issue such amount of stock to him, it pay to him the highest value the stock attained intermediate between the date of the appropriation and the expiration of a reasonable time for him to purchase the stock after he received notice of the appropriation, interest on such amount, and the dividends on the stock that were declared while the misappropriation was in force, with interest.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 380, 390–402; Dec. Dig. ⊕⇒93.]

Appeal from the District Court of the United States for the District of Utah; J. A. Marshall, Judge.

Suits by Joseph L. Wilson and by Joseph L. Wilson and another against the Colorado Mining Company. From decrees for defendant, plaintiffs appeal. Reversed and rendered.

The appellants were plaintiffs below, where these cases, which related to stock originally owned by Joseph L. Wilson, were heard and decided together. Wilson complains that the court below declined to require the Colorado Mining Company, a corporation, to restore to him and to pay him the dividends on 5,000 shares of its nonassessable stock, which it had, without authority, assessed, sold to itself, and appropriated to its own use for a failure to pay that assessment. He sought this relief by a suit in equity, the court below dismissed his suit on the merits, and counsel for the company insist that the dismissal was right: (1) Because the complainant was estopped from maintaining it by his abandonment of his rights and his laches; (2) because his suit was barred by the compromise of and the judgment in his former action at law; and (3) because his suit was barred by the splitting of his cause of action which his former action wrought.

The Colorado Mining Company was incorporated in December, 1898, with a capital stock of $125,000, divided into 250,000 shares, of the par value of 50 cents a share. Prior to its organization Wilson was the owner of mining claims which he conveyed to the company for 73,334 shares of its stock, for which the company executed its certificates to him, but held them in its stock book under an agreement between it and the other stockholders, who purchased their stock with mining claims, that all this stock should be held by it for them, and that none of it should be sold until the treasury stock of the company should be first disposed of. Wilson was not only the owner of this large amount of stock, but he was the manager of the company until, in February, 1899, he was taken seriously ill and went to St. Mark's Hospital

in Salt Lake City, where he remained about two months, and then continued disabled for many months thereafter. He was unable to pay the hospital in full for its services, and on May 9, 1899, to secure a balance of $80 which he owed it, he made a written order, directed to the president of the Colorado Company to "issue in the name of St. Mark's Hospital five thousand (5,000) shares Colorado stock, and deliver the same to Dr. Croxall. This is for security of a bill I owe the hospital." Thereupon the company took 5,000 shares out of a certificate to Wilson of a much larger number of shares, and issued a certificate for 5,000 shares in the usual form to St. Mark's Hospital, but retained it in the possession of its secretary. At the same time Brown, as secretary of the corporation, issued and delivered to the hospital a certificate that he held the certificate for 5,000 shares in favor of the hospital in his possession until such a time as Wilson should pay to the hospital $80, or a satisfactory equivalent for its services. On May 15, 1899, Wilson pledged 10,000 shares of his stock to the plaintiff Croxall to secure $150, and like writings were made, delivered, and held by the respective parties to that pledge. On March 27, 1907, while Wilson held his interest as pledgor in these 15,000 shares of stock, and while he also owned other stock in the company which was not pledged, he demanded his certificates of stock of the company, and it refused to deliver any of the stock, or any certificate of any of it, to him on the ground that it held them in trust under the agreement heretofore stated until the treasury stock was sold. The Colorado Company had ceased mining operations and business in the fall of 1899, and about March 27, 1900, Wilson left the state of Utah and remained absent from that time until some time in the year 1907. Meanwhile, between May 1, 1900, and August 1, 1900, the Colorado company went through the form of levying an assessment upon, making a sale of, and transferring to itself the 5,000 shares then owned by Wilson as pledgor and the hospital as pledgee, and the 10,000 shares then owned by Wilson as pledgor and Croxall as pledgee, the certificates for all of which were held in the possession of the secretary of the company. About the time the assessment was made the hospital was informed thereof, but declined to pay it. There is a conflict of evidence on the question whether or not Croxall received any notice of the assessment or of the sale at any time prior to the fall or winter of the year 1907. But the evidence is conclusive that Wilson never received any notice, and never had any knowledge of the assessment, sale, or misappropriation until he returned to Salt Lake City some time in the fall of the year 1907, and then he obtained this information with difficulty, for the officers of the company denied his request to permit him to inspect its books.

Wilson knew that he had assigned the 15,000 shares of his stock to the hospital and Croxall, but he had forgotten that he had assigned it as security for his two debts only, and supposed that his assignments were indefeasible, and the only papers which evidenced the transaction were in the possession of the Colorado Company, the hospital, and Croxall. On November 27, 1907, he commenced an action at law against the company for that part of his stock, or the value thereof and the dividends thereon, which he had not assigned to the hospital or Croxall. He expressly alleged in his complaint that he had subscribed for and was originally entitled to 73,334 shares of the stock of the corporation, and that he was entitled to have issued to him all these shares, except 15,000 shares which he alleged that he had theretofore sold and delivered. In its answer the defendant not only admitted, but expressly alleged, that "on or about the 9th day of May, 1899, the plaintiff, for and in consideration of certain hospital fees, sold and delivered to the St. Mark's Hospital of Salt Lake City, Utah, 5,000 shares of the capital stock of defendant corporation," and that "on or about the 15th day of May, 1899, in consideration of medical services rendered by one Dr. W. Y. Croxall, plaintiff sold and delivered to the said Croxall 10,000 shares of the capital stock of defendant corporation then owned by plaintiff." On January 27, 1908, this action at law was compromised and settled by the entry of judgment for and payment of $4,500 upon a written stipulation of the attorneys for the parties "that the plaintiff in said action have and recover judgment in said action against said defendant for the sum of $4,500 in full satisfaction of all claims and demands of said plaintiff set forth in his complaint in said action."

Some time in June, 1908, Wilson learned that he had not assigned the stock here in controversy absolutely, and he went to the hospital and procured its release and satisfaction of the claim it held on the 5,000 shares to secure the payment of the $80 he owed to it and an assignment of the hospital's claim against the Colorado Company, and on September 8, 1898, he brought this suit. About June, 1907, Wilson first ascertained that his assignment to Croxall was not absolute, and on July 6, 1908, he assigned his claim against the Colorado Company for the 10,000 shares of stock, or the value thereof, and the dividends thereon, to Croxall, and on September 6, 1908, the latter commenced an action at law for the 10,000 shares, or the value thereof, and the dividends thereon, against the company. The corporation answered, among other things, that Croxall was estopped from maintaining his suit by Wilson's action at law and the compromise thereof, and it commenced a suit in equity against Croxall on the ground of that estoppel for the purpose of enjoining him from prosecuting his action at law. Thereupon Wilson and Croxall tendered the $4,500 which Wilson had received in settlement of his action at law and the interest thereon to the company, and demanded the avoidance of the judgment in that action. The tender was declined, the demand was denied, and on the 2d day of August, 1909, Wilson and Croxall instituted the suit in equity herein, in which they pleaded the facts which have been recited and the additional fact that Wilson was induced to compromise his action at law by the false representation of the agents or officers of the Colorado Company that he had sold and assigned 2,000 shares of his stock to William W. Brown, and they pray for the avoidance of the judgment of compromise and the stipulation upon which it was entered, that the company be required to issue 10,000 shares of its stock and to pay the dividends thereon to Croxall, and to issue 7,000 shares of stock and to pay the dividends thereon to Wilson. The Colorado Company answered this complaint by a repetition of its defenses and claims, and at the final hearing this suit was dismissed, and Croxall and Wilson appealed. The record contains other facts, but none that affect the result which those already recited compel.

M. E. Wilson and Russell G. Schulder, both of Salt Lake City, Utah (Dickson, Ellis, Ellis & Schulder and W. H. King, all of Salt Lake City, Utah, on the brief), for appellants.

Andrew Howat, of Salt Lake City, Utah (H. R. Macmillan and Frank K. Nebeker, both of Salt Lake City, Utah, and E. E. Corfman, of Provo, Utah, on the brief), for appellee.

Before SANBORN and CARLAND, Circuit Judges, and TRIE-BER, District Judge.

SANBORN, Circuit Judge (after stating the facts as above). [1] Under the laws of the state of Utah and under the law of its organization the Colorado Company had no authority to assess the 15,000 shares of its stock which are the subjects of these suits, to sell them for the assessment, or to appropriate them to itself. In the belief that it had that authority it did these things, and it has ever since insisted and still contends that it thereby acquired the right to own and hold them for its own use and benefit. But an owner cannot be lawfully deprived of his property without his consent and without due process of law, and the Colorado Company took Wilson's interest in this stock without either. A corporation which, without lawful authority, appropriates to itself its stock owned by another, or the valuable interest of another, of which it is aware, in its stock, thereby becomes liable at the option of the owner to restore to him the stock or the interest therein and the dividends thereon, or to pay the dam-

ages caused by the taking, and its ignorance of the law or belief in its right to commit the wrong is no defense to that liability. Telegraph Co. v. Davenport, 97 U. S. 369, 371, 372, 24 L. Ed. 1047; Geyser-Marion Gold Min. Co. v. Stark, 106 Fed. 558, 560, 45 C. C. A. 467, 469, 53 L. R. A. 684.

This liability is not denied. The defense is that it was avoided by Wilson's abandonment and laches. The Colorado Company not only subjected itself to the ordinary liability of a corporation appropriating to itself without authority the stock of one of its stockholders, but when it took the stock here in controversy under the unauthorized assessment it had full knowledge that it held all Wilson's stock in trust until the treasury stock was sold, and that he was the owner of the 15,000 shares, subject only to the pledge of 5,000 of them to the hospital to secure his debt of $80, and the pledge of 10,000 of them to Croxall to secure his debt of $150. It had withheld its certificates to the pledgees from their possession, and Brown, as its secretary, had given them written declarations that he held the certificates for them until the two debts were paid. In March, 1900, about two months before the assessment, the company had refused to deliver to Wilson any of his stock or certificates, upon the express ground that it held them until the treasury stock should be sold under the agreement to that effect between it and the stockholders who paid for their stock with mining claims.

[2] The test of abandonment of property is the existence or non-existence of the intent to abandon. Manhattan Life Ins. Co. v. Wright, 126 Fed. 82, 89, 61 C. C. A. 138, 145; Saxlehner v. Eisner & Mendelson Co., 179 U. S. 19, 31, 21 Sup. Ct. 7, 45 L. Ed. 60; Dawson v. Daniel, 7 Fed. Cas. 215, 216, Fed. Cas. No. 3,669; Singer Mfg. Co. v. June Mfg. Co., 163 U. S. 169, 186, 16 Sup. Ct. 1002, 41 L. Ed. 118; Moore v. Stevenson, 27 Conn. 14; Livermore v. White, 74 Me. 452, 43 Am. Rep. 600; Judson v. Malloy, 40 Cal. 299; Hickman v. Link, 116 Mo. 123, 22 S. W. 472. The presumption is that the owner of property or of rights to property intends to preserve them, because this is the customary purpose of such owners, and the burden is on him who alleges abandonment clearly to establish the intent to abandon by evidence sufficient to overcome this strong natural presumption. Before Wilson left Utah, and in March, 1900, he demanded his stock of the company, and it refused to deliver it to him, because it held it in trust for him until its treasury stock was sold. When the company, without authority, appropriated to itself the property of Wilson in the stock in controversy in these suits in the summer of the year 1900, he was absent from the state of Utah, and he had no knowledge or notice of its action until the autumn of the year 1907, and he demanded his stock and brought his action at law against the company for all of it, except the 15,000 shares on November 27, 1907. He supposed these assignments of the 15,000 shares were absolute, and he did not learn that they were defeasible until June, 1908. He redeemed the 5,000 shares from the Hospital Company, and brought this suit in equity to avoid the assessment and transfer to the Colorado Company and to secure the reissue of the stock to himself on September 8, 1908. He assigned the 10,000 shares to Croxall, and the latter brought his

action at law to recover it, or the value of it, on September 6, 1908, and after the Colorado Company brought its suit in equity to enjoin that action Wilson and Croxall on August 2, 1908, commenced their suit in equity now under review for the avoidance of the assessment and transfer to the company of these 10,000 shares, for the issue of the stock to Croxall and for the dividends. There is no other evidence of any intent of Wilson to abandon his stock, or his rights therein, and this evidence has produced a strong and abiding conviction that he not only never intended to abandon his interest in any of the stock or his rights of action against the company, but that his intention always was to hold and secure the full benefit of them. His suit cannot be defeated on the ground of abandonment.

[3] But counsel insist that he was guilty of laches. How could he be? When he left Utah in March, 1900, his stock was held in trust for him by the Colorado Company until the treasury stock should be sold, with full knowledge on the part of that company that the only rights of the hospital and Croxall in the 15,000 shares were those of pledgees. The company was without power to assess this stock, or to sell it for any assessment. It had never assessed any of its stock, or intimated any purpose so to do, and Wilson had no more notice or reason to suspect that it would do so than he had to suspect that it would forge his name to a transfer of its stock, or would deprive him of it in any other unlawful way, and this condition of things continued until the autumn of 1907, when he learned for the first time of the company's unauthorized appropriation of the stock to itself in the year 1900. Until the autumn of 1907 he had no knowledge, no notice of any kind, no notice of any fact which would put a person of ordinary prudence and diligence on inquiry for the unauthorized appropriation of this stock by his own company for its own benefit. Now the company pleads the laches of Wilson, pleads that he is estopped from recovering for its wrong, because he did not expect it to violate the law, because he did not stand by and watch for its wrongdoing and sue it quickly. It does not lie in the mouth of this company to make that plea. "If a person be ignorant of his interest in a certain transaction, no negligence is imputable to him for failing to inform himself of his rights; but if he is aware of his interest, and knows that proceedings are pending the result of which may be prejudicial to such interest, he is bound to look into such proceedings so far as to see that no action is taken to his detriment." Foster v. Mansfield, Coldwater & Lake Michigan R. R. Co., 146 U. S. 88, 99, 100, 13 Sup. Ct. 28, 32 (36 L. Ed. 899). Wilson had no notice of the pendency or probable pendency of the unlawful proceedings from which he suffered until the summer of 1907.

The basis of laches is estoppel, and where there is no estoppel there is no laches. Layton Pure Food Co. v. Church & Dwight Co., 182 Fed. 24, 32, 39, 104 C. C. A. 464, 472, 479. Indispensable elements of such an estoppel are: (1) Wilson's active or culpably negligent misrepresentation of an important fact; (2) the defendant's ignorance and lack of notice of the truth concerning it; (3) the action or inaction of the defendant induced by the misrepresentation; and (4) its injury by the presentation of and action upon the truth. The fact upon the misrep-

resentation of which reliance must be had by the defendant to work the laches in this case is the plaintiff's insistence upon his right to avoid the unauthorized appropriation of his stock by the defendant. But Wilson was ignorant of that right, and made no representation concerning it until he discovered the misappropriation in the autumn of 1907. He was guilty of no unreasonable delay thereafter, and he was guilty of no negligence before, for then he had no notice of the wrong of the company. The company was not ignorant, but knew all the facts about its wrong and about the rights of the plaintiff arising therefrom. It was not induced by his misrepresentation or his silence to act or to refrain from acting, and it will suffer no injustice or wrong if the truth be presented and the company be required to surrender that which it has derived from its unauthorized misappropriation to itself of the property of the plaintiff. All the essential elements of estoppel and of laches are wanting here, and Wilson may not be lawfully defeated thereby. The doctrine of laches is an equitable principle, which is applied to promote, but never to defeat, justice. An application of it to defeat Wilson would defeat justice and sustain injustice.

The analogous statute of limitations at law bars the action three years after the discovery by the aggrieved party of the facts constituting the fraud or mistake. Comp. Laws Utah 1907, § 2877. These suits were brought within that time. Mere delay and the increase in the value of the property are not such circumstances as entitle a wrongdoer to the application of the doctrine of laches within the time fixed by the analogous statute of limitations of the action at law (Indiana & Arkansas Lbr. & Mfg. Co. v. Brinkley, 164 Fed. 963, 969, 970, 91 C. C. A. 91, 97, 98), and there are no unusual circumstances or conditions, such as the interposition of the rights of innocent third parties, the death of important witnesses, or the loss of documentary evidence, combining with changes in the value of the property to invoke the application of the doctrine of laches. Kelley v. Boettcher, 85 Fed. 55, 62, 29 C. C. A. 14, 21; Brun v. Mann, 151 Fed. 145, 154, 80 C. C. A. 513, 522; Cook, Corporations (7th Ed.) § 731. Wilson was guilty of no laches.

[4] But counsel argue that the pledgees, the hospital and Croxall, had notice of the assessment and of the sale thereunder in 1900 when they were made, that Wilson is estopped by their laches, and they cite section 330 of the Compiled Statutes of Utah of 1907, which provides that the delivery of a stock certificate of a corporation and a written transfer thereof, signed by the owner, to a bona fide purchaser or pledgee for value, shall be deemed a sufficient transfer of the title against any creditor of the transferor and all other persons whomsoever, but that for the purpose of voting, of receiving dividends, of levying and collecting assessments, and other matters in which the corporation is interested, the holder of record shall be treated and considered as the holder in fact, and the transferee shall have no rights or claims as against the corporation until transfer thereof on the books of the corporation, or a new certificate issuing to him. But this section simply states the general law regarding lawful assessments, transfers, and dividends. It in no way relieves a corporation from its lia-

bility at law or in equity for unauthorized assessments, sales, or appropriations to itself of the property rights or interests of pledgors or other parties in interest in its stock, of which it has full notice while the stock is in its possession and control.

For the purposes of the discussion of these cases it will be conceded, but it is not admitted or decided, that the pledgees received notice in 1900 of the assessment and sale of the stock. They were not, however, aware of the fact that those proceedings were beyond the power of the corporation and wrongful. They gave the matter no attention, and brought no actions until 1907. If they were guilty of laches, how can that laches avail to estop Wilson, who was not guilty of laches, from recovering his interest in the stock from the wrongdoer that had full knowledge that he held this interest and appropriated it to its own use? Undoubtedly, after the new certificates to the pledgees were executed, the pledgees, if they could have obtained delivery of those certificates from the Colorado Company, whose secretary still held them, might have so assigned and delivered them to a purchaser for value without notice of Wilson's interest therein as to estop him from recovering that interest from such a purchaser. There is no less doubt that such a person, who had notice of Wilson's interest when he purchased the stock, would take nothing but the liens of the pledgees. The Colorado Company knew that the only interest the hospital had in the 5,000 shares was its lien for $80, and that the only interest Croxall had in the 10,000 shares was his lien for the $150, and that Wilson was the owner of the shares, subject only to those liens, when it misappropriated them to its own use by the unauthorized levy and sale.

The appropriation to himself or the loss of collateral securities by a pledgee, either intentionally or by culpable negligence, is both a tort and a breach of the contract of pledge, and the pledgor may maintain an independent action either in tort or upon the contract, at his option, against the pledgee for the value of the securities of which he is deprived. Brown v. First Nat. Bank, 132 Fed. 450, 453, 66 C. C. A. 293, 296; Colebrooke on Collateral Securities, § 131. And by the same mark the unauthorized and intentional appropriation to itself by a corporation of collateral securities in its possession or under its control with full knowledge of the interest of the pledgor therein, although with the voluntary transfer, consent, acquiescence, negligence, or laches of the pledgee, is both a tort and a breach of trust, and the pledgor may maintain at his option a suit in equity for their recovery, or an action at law for the value of his interest therein. Even if the Colorado Company had not been a trustee to hold the stock for the pledgor and the pledgee, before its appropriation to itself, that appropriation would have made it a trustee de son tort for the pledgor. The pledgees cannot, by their silence, acquiescence, or laches, vest in the unauthorized appropriator, who has knowledge of the interest and rights of the pledgor, more than they could vest by their assignment, nor more than their liens. The laches of the pledgees, if it existed, did not deprive Wilson, who was guilty of no laches, of his right to maintain suits in equity against the Colorado Company for his stock, or actions at law for the value of his interest therein. And as Croxall by assign-

ment has the rights of Wilson in the 10,000 shares, neither of these suits was barred by laches.

[5] The next contention relates to the compromise judgment for $4,500 in Wilson's action at law for the 58,334 shares of stock or their value and the dividends thereon. Counsel for the Colorado Company argue that this was a judgment of compromise of all the claims of Wilson on account of these 15,000 shares, as well as of the 58,334 shares for which he sued in that action, and there is testimony in the record to the effect that such was the understanding with which the stipulation for the judgment was signed. But there is also testimony to the contrary. In view of this contradiction in the testimony, the controlling evidence is in writing. In the complaint and in the answer it is expressly averred that these 15,000 shares had been previously assigned by Wilson, they are excepted from the claim of the complaint, the exception is emphasized by the averments of the answer, and the written stipulation of compromise is for judgment for the sum of $4,500 "in full satisfaction of all claims and demands of said plaintiff set forth in his said complaint." The claims on account of these 15,000 shares were not set forth in that complaint, and the record convinces that they were not considered, compromised, or adjudged in that case.

Counsel invoke the rule that one may not split his cause of action, and that if he conduct to final judgment an action upon a part of an entire demand, such judgment is a bar to an action upon the remainder thereof, and argue that Wilson's cause of action was the failure of the Colorado Company to perform its part of Wilson's contract of subscription for its stock, that it was therefore single and indivisible, and that as he obtained judgment in his action at law for the value of a part of the stock for which he subscribed he is barred from maintaining suits in equity for the remaining 15,000 shares not included in that action. There are many reasons why these suits may not be defeated upon this ground. In the first place, if the claims to recover on account of the 15,000 shares were a part of the indivisible cause of action first brought by Wilson, the pleadings in that case that this stock had been sold and assigned to the hospital and to Croxall, and the testimony of Wilson that he did not know, during the pendency of these actions, that those assignments were defeasible, present such convincing evidence that the claims now in suit were omitted from Wilson's first action by mutual mistake that a court of equity ought not to hesitate to exercise its immemorial jurisdiction to relieve from such a mistake, and to permit the suits upon these claims to be maintained. In the second place, the evidence has convinced that during the pendency of that action Wilson had forgotten and had no knowledge that his assignments of the 15,000 shares were defeasible, no knowledge that he had any cause of action on account of the misappropriation of the 15,000 shares. And claims which are part of an entire and indefeasible cause of action, but of which the plaintiff has no notice during the pendency of an action upon it for other parts thereof, are excepted from the general rule, and an action upon them may be maintained after judgment in the first action. Lord Bagot v. Williams, 3 Barn. & Cress. 235, 107 Eng. Reports Reprint, 721, 722,

723; Kane v. Morehouse, 46 Conn. 300, 304; Gedney v. Gedney, 160 N. Y. 471, 475, 55 N. E. 1; Bendernagle v. Cocks, 19 Wend. (N. Y.) 207, 209, 32 Am. Dec. 448; Johnson v. Provincial Ins. Co., 12 Mich. 216, 222, 86 Am. Dec. 49. But, in the third place, if, as counsel contend, Wilson's cause of action at law was the breach by the company of his contract of subscription, that was not his cause of action in these suits in equity, nor were these causes a part of his demand on account of that breach. The company had signed certificates to Wilson of the 15,000 shares of stock, had afterwards segregated these 15,000 shares from all his other stock, canceled his certificates for them, signed new·certificates for the 15,000 shares to the pledgees, the hospital, and Croxall, with full knowledge that they were mere securities for the $80 and $150 which he owed to them, respectively, and those certificates were in the possession of its secretary before the unauthorized assessment and sale of this stock to the company was made. And the unauthorized appropriations by the company of the 5,000 shares pledged to the hospital and the 10,000 shares pledged to Croxall were Wilson's causes of action in these suits. At the time his first action at law was pending, Wilson's debts secured by this stock had not been paid, nor had his claim against the company been assigned. He had the option to sue the company at law for a conversion of the 15,000 shares of stock, or in equity for their restoration to him. To the suit in equity for the 5,000 shares the hospital was then a proper party, and to the suit in equity for the 10,000 shares Croxall was a proper party; but neither of them was a proper party to his action at law for the 58,334 shares, or their value, and the conclusion is that the causes of action on which these suits in equity are based were not a part of Wilson's indivisible demand for a breach by the company of his contract of subscription during the pendency of his action at law, but were separate causes of action for suits in equity for separate appropriations to itself by the company of the 5,000 shares certified to the hospital and the 10,000 shares certified to Croxall and that other parties than those proper in his action at law were then proper parties to such suits. The suits here under consideration cannot be defeated on the theory that Wilson has split his cause of action.

[6] In the suit brought by Wilson and Croxall they seek to recover, in addition to the 10,000 shares pledged to Croxall, 2,000 shares which belonged to Wilson, but which were transferred from him to Brown, the secretary of the company, in 1898, without any authority from Wilson. But Wilson sued the company for this stock, or its value, and for the dividends thereon, in his action at law that was compromised and settled. He and his assignee, Croxall, pray that the compromise and judgment in that case be set aside, and that they recover these 2,000 shares of·stock, on the ground that Wilson was induced to make the compromise of his action at law by the representations, made by the agents or officers of the Colorado Company at the time of the compromise, that Wilson had signed an assignment of that 2,000 shares, when the truth was that he had never done so. Conceding that the misrepresentation pleaded was made, and conceding the fact that Wilson never authorized the transfer, these facts present no such

equity as would sustain a decree for the avoidance of the judgment of compromise and the recovery of the 2,000 shares. Wilson alleged in his complaint in his action at law that he had never assigned or authorized the assignment of these 2,000 shares, and he verified that complaint. The Colorado Company answered that Wilson had sold and delivered these shares to Brown for services performed by the latter at Wilson's request, and this answer was verified by the president of the corporation. Now, if any agent or officer of the corporation represented at the time of the settlement of the action ·that Wilson had signed an assignment of the 2,000 shares of the stock to Brown, this was not a stronger representation than the sworn statement of the president to the same effect found in the answer. The fact undoubtedly is that throughout the pendency of that action Wilson asserted, and the company denied, that he had authorized the transfer of this stock to Brown. No doubt the assertion of each was one of the inducements that caused the other to assent to the compromise; but that fact is insufficient to sustain a suit to avoid it, although subsequent to the compromise it clearly appears that one was right and the other wrong. If the opposite rule were adopted, no compromise of issues in litigation could stand. The compromise and judgment bar any relief to Wilson or Croxall on account of the 2,000 shares.

In the year 1906, the capital stock of the Colorado Company was increased from $125,000, divided into 250,000 shares, of the par value of 50 cents a share, to $200,000, divided into 1,000,000 shares, of the par value of 20 cents a share. And in their complaints the plaintiffs ask to recover 15,000 of the additional shares and the dividends thereon on account of the 5,000 shares, and 30,000 of the additional shares and the dividends thereon on account of the 10,000 shares. But the evidence persuades that the additional shares and their proceeds were applied to the use and benefit of the corporation, and that none of them was distributed to any of the stockholders as a dividend, or a part of a dividend. There is, therefore, no proof to sustain any relief on account of the increase of the capital stock.

Let the decrees below be reversed, and let a decree be rendered in Wilson v. Colorado Mining Company that the attempted assessment, sale, and appropriation by the company to itself of the 5,000 shares of stock were unauthorized, and are set aside and for naught held; that the company issue and duly register in its books in the name of Wilson as owner 5,000 shares of its stock, and issue and deliver to him a stock certificate in the usual form to the effect that he is the owner thereof, and extend to him the usual rights of owners of stock to vote, act, and receive dividends; that in case it has issued all its stock, or for any other reason cannot without further action issue such stock, it purchase the necessary amount of its stock to enable it to comply with the foregoing requirement, cause this stock to be duly transferred to Wilson, and then register, record, and issue to him the 5,000 shares and the certificate thereof, and otherwise comply with the foregoing requirement (Pratt v. Taunton Copper Co., 123 Mass. 110, 112, 25 Am. Rep. 37; Pratt v. Boston & Albany R. R. Co., 126 Mass. 443; Boston & Albany R. R. Co. v. Richardson, 135 Mass. 473,

474, 477, 478; 1 Cook, Corporations [7th Ed.] § 284; 2 Cook, Corporations [7th Ed.] § 367); that Wilson recover of the Colorado Company an amount equal to the sum of the dividends that the company has declared on 5,000 shares of its issued stock intermediate between 1900 and the date of the decree, and interest on such dividends from the respective times when they became payable, and his costs and disbursements in this case, and that he have judgment and execution therefor; that in case the Colorado Company fails to vest in Wilson, or to duly record in its books in his name as owner, or to issue and deliver to him, its stock certificate for 5,000 shares of its valid stock within 90 days after the entry of the decree, then said Wilson recover of it, in addition to the foregoing amounts, a further amount equal to the highest intermediate value of the 5,000 shares of stock between July, 1900, and January 1, 1909, a reasonable time for Wilson to have purchased the 5,000 shares after he discovered their misappropriation and his interest in them as pledgor, and interest on that amount from that date (Telegraph Co. v. Davenport, 97 U. S. 369, 371, 24 L. Ed. 1047; McKinley v. Williams, 74 Fed. 94, 103, 20 C. C. A. 312; 2 Cook, Corporations [7th Ed.] § 581, p. 1727, note 1; Baker v. Drake, 53 N. Y. 211, 217, 13 Am. Rep. 507; In re Swift [D. C.] 114 Fed. 947, 949; Walley v. Deseret National Bank, 14 Utah, 305, 315, 47 Pac. 147); and that he have judgment and execution to collect the same. Let the decree also contain such further provisions, consistent with the views expressed in this opinion, as may commend themselves to the judgment of the court below.

Let a like decree regarding the 10,000 shares be rendered in favor of the plaintiff Croxall in the suit of Wilson and Croxall against the Colorado Mining Company.

⚖══For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes