### ALLEN v. WALKER & GIBSON.

(District Court, N. D. New York. August 17, 1916.)

1. TRADE-MARKS AND TRADE-NAMES ⬚34—ASSIGNMENT—VALIDITY.

A trade-mark cannot be assigned, disconnected from the business and good will with which it has been connected.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 38; Dec. Dig. ⬚34.]

2. TRADE-MARKS AND TRADE-NAMES ⬚33—ASSIGNMENT—VALIDITY.

The owner of a business and trade-mark connected therewith made an assignment of the trade-mark alone to his wife, who at once assigned it to a corporation, at the same time that her husband transferred to the corporation the business and good will, and as part of the same transaction. Held, that the transfers, taken together, were sufficient to vest the corporation with title to the trade-mark.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 37; Dec. Dig. ⬚33.]

3. TRADE-MARKS AND TRADE-NAMES ⬚3(1), 59(5)—VALIDITY OF TRADE-MARK—ARBITRARY NAME—INFRINGEMENT.

The word "Cedarine" held an arbitrary word, and valid as a trade-mark for a furniture polish; also held infringed by the name "O-Cedar," applied to a similar and competing article.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 4, 71; Dec. Dig. ⬚3(1), 59(5).]

---

4. TRADE-MARKS AND TRADE-NAMES ⟨⇒57—INFRINGEMENT.

It is not necessary, to constitute infringement of a trade-mark, that the similarity should be such as to deceive a cautious purchaser; but it is sufficient if it would deceive the ordinary unwary purchaser.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 65; Dec. Dig. ⟨⇒57.]

5. TRADE-MARKS AND TRADE-NAMES ⟨⇒11—VALIDITY.

Complainant obtained a patent for a furniture polish, and about the same time registered the word "Cedarine" as a trade-mark for a furniture polish. He never made nor sold the patented composition to any extent, but made a different polish, which for many years was sold under the name "Cedarine" as a, trade-mark, and which was never marked as patented, although in one pamphlet, issued some years afterward to advertise Cedarine, he made the statement incidentally that it was patented. *Held*, that he was not concluded by such single statement, and that the trade-mark, not having been applied to the patented article, but to a different one, did not become open to the public on the expiration of the patent.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 15; Dec. Dig. ⟨⇒11.]

6. TRADE-MARKS AND TRADE-NAMES ⟨⇒86—SUIT FOR INFRINGEMENT.

A complainant, who commenced suit for infringement of his trade-mark within two years after he had knowledge of the infringement, so far as appeared, *held* not barred by laches of the right to an injunction.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 95; Dec. Dig. ⟨⇒86.]

7. TRADE-MARKS AND TRADE-NAMES ⟨⇒45—LIMITATION BY FOREIGN REGISTRATION.

That complainant, in order to obtain registration of the arbitrary word "Cedarine" as a trade-mark in Great Britain, was required to, and did, disclaim any right to the exclusive use of the word "Cedar," does not affect his rights, nor limit the scope of his trade-mark in the United States.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 53, 59; Dec. Dig. ⟨⇒45.]

8. TRADE-MARKS AND TRADE-NAMES ⟨⇒85(1)—INFRINGEMENT—RIGHT TO RELIEF IN EQUITY.

A complainant *held* not chargeable with fraudulent conduct or false representations on his label, which deprived him of the right to relief in equity against infringement of his trade-mark.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 94; Dec. Dig. ⟨⇒85(1).]

9. TRADE-MARKS AND TRADE-NAMES ⟨⇒98—SUIT FOR INFRINGEMENT—RIGHT TO ACCOUNTING.

Defendants, who without misrepresentations sold an article under a trade-mark which infringed that of complainant for two years before the commencement of suit, under such circumstances that their sales should have been known to complainant, and without notice of infringement, should not be required to account for profits or damages.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 112; Dec. Dig. ⟨⇒98.]

In Equity. Suit by George H. Allen against Walker & Gibson. On final hearing. Decree for complainant.

Suit in equity to restrain alleged infringement of complainant's registered trade-mark "Cedarine" by the use by defendant of the name "O-Cedar" and for an accounting. The goods dealt in and sold by each party, and to which such names respectively are applied, are similar in character; both being a furniture polish.

⟨⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Martin & Jones, of Utica, N. Y., for complainant.

Rosendale, Hessberg, Dugan & Haines, of Albany, N. Y. (Charles W. Hills, of Chicago, Ill., and Albert Hessberg, of Albany, N. Y., of counsel), for defendant.

RAY, District Judge. In 1886 the complainant, George H. Allen, of Clinton, N. Y., began the business of manufacturing and selling a furniture polish at that place, and he placed on the bottles and containers a label with certain descriptive words and the trade-mark or name "Cedarine." So far as appears, he was the first to coin and use this word "Cedarine." He built up quite an extensive business, and became quite widely and extensively known as "Cedarine Allen," a name which he adopted and used in various ways in such business and in advertising, and in which he seems to take pride. June 7, 1887, on his application, there was registered and issued to said George H. Allen a trade-mark. In his statement and declaration he said:

"My trade-mark consists of the word 'Cedarine.' This has generally been arranged or inclosed within a diamond-shaped figure, which in turn is surrounded by a larger figure of similar shape; the sides of these figures being arranged parallel with each other."

He also describes the use and placing of certain words between the lines of these figures, but says:

"These words are printed in small type, while the word 'Cedarine' is formed of large letters, to make it prominent."

He makes other remarks, and says:

"The essential feature of which [trade-mark] is the arbitrary word 'Cedarine.'"

He also says therein:

"This trade-mark I have used continuously in my business since November 1, 1886. The class of merchandise to which this trade-mark is appropriated is polishes, and the particular description of goods comprised in said class on which I use it is furniture and piano polish. It is my practice to apply my trade-mark to the bottles, boxes, or packages containing the polish by means of suitable labels on which it is painted. The word and trade-mark are sometimes also blown into the bottles containing the polish."

In 1891 Allen incorporated this business in the state of New York under the name "Cedarine Manufacturing Company," with an authorized capital stock of $25,000. Allen was manager of the business of this corporation until 1897, when a corporation was organized under the laws of the state of Michigan, at Hastings, in that state, under the name Cedarine Manufacturing Company, and this corporation took over a furniture manufacturing plant at that place, and this corporation took orders for furniture polish bearing the name "Cedarine"; but the goods were manufactured and put up for market at Clinton, N. Y. At about this time all the stockholders of the New York corporation turned over their stock therein to complainant, and he in their behalf, as well as his own, assigned the furniture polish business at Clinton, N. Y., including the good will, to said Michigan corporation. March 28, 1898, the Michigan corporation transferred the

said trade-mark, and also all the property at Clinton, N. Y., connected with the manufacture of Cedarine, to the complainant here.

In May or June, 1898, Allen returned to Clinton, N. Y., where until October of that year he conducted this furniture polish business, using the trade-mark name "Cedarine." At this time the business was again incorporated under the laws of the state of New York, but under the name "Cedarine Allen Company." When the Michigan corporation went out of business, March 28, 1898, a written transfer to George H. Allen of the business and this trade-mark was executed and signed by "George H. Allen, Secy." He was the secretary of that corporation, and while the defendant here vigorously attacks this transfer, I think it was sufficient under all the circumstances to transfer to Allen, not only the business, but the trade-mark, and that he again became its owner. It does not appear that there was any formal dissolution of this Michigan corporation, and defendant contends that it went out of business and abandoned to the public all its rights to this trade-mark; but I do not think this contention is sustained. These transactions were somewhat informal, but there is no evidence to question or dispute the statement of the complainant, or the plaintiff's exhibits, bearing on this question of the ownership of the trade-mark.

At the time of the incorporation in October, 1908, Allen transferred to his wife this registered trade-mark by an instrument in writing, but which does not in terms include the good will of the business. This certificate of incorporation stated:

"The object and nature of the business for which this corporation is to be formed is the manufacture and sale of Cedarine furniture polish, and other polishes, liquid glue, furniture, and advertising novelties."

M. E. Allen subscribed for 19,760 shares of stock in this Cedarine Allen corporation, and in consideration of $50,000 of the stock she assigned to such corporation this registered trade-mark No. 14,482. Allen himself subscribed for 20,000 shares of the stock and conveyed the business to the new corporation. The transfer from George H. Allen to M. E. Allen reads as follows:

"Whereas, I, George H. Allen, of Clinton, county of Oneida, and state of New York, did obtain letters patent of the United States for the registration of a certain trade-mark for furniture polish, which letters patent are No. 14,482, and bear date the 7th day of June, 1887; and

"Whereas, I, the said George H. Allen, am now the sole owner of said letters patent and of all rights under the same; and

"Whereas, M. E. Allen, of Clinton, county of Oneida, and state of New York, is desirous of acquiring the entire interest in the same:

"Now, therefore, to all whom it may concern, be it known that for and in consideration of the sum of one dollar to me in hand paid, the receipt of which is hereby acknowledged, and in consideration of natural love and affection, I, the said George H. Allen, have sold, assigned, and transferred, and by these presents do sell, assign, and transfer, unto the said M. E. Allen all my right, title, and interest in and to the said trade-mark for furniture polish, and in and to the letters patent therefor aforesaid, the same to be held and enjoyed by the said M. E. Allen for her own use and behoof, and for the use and behoof of her legal representatives, to the full end of the term for which said letters patent are granted, as fully and entirely as the same would have been held and enjoyed by me, had this assignment and sale not been made.

"In testimony whereof, I have hereunto set my hand and affixed my seal at

Clinton, in the county of Oneida, and state of New York, this 19th day of October, A. D. 1898.

"In the presence of                                                Geo. H. Allen.    [L. S.]
    "J. T. List.
    "D. W. Allen."

The transfer from M. E. Allen to the Cedarine Allen Company reads as follows:

"Whereas, George H. Allen, of Clinton, county of Oneida, and state of New York, did obtain letters patent of the United States for the registration of a certain trade-mark for furniture polish, which letters patent are numbered 14,482 and bear date the 7th day of June, 1887; and

"Whereas, the said George H. Allen, by a due and proper instrument in writing has sold and assigned his said patent, and his rights in, to, and under the same, unto Mary E. Allen, of Clinton, county of Oneida, and state of New York; and

"Whereas, I, the said Mary E. Allen, am now the sole owner of said patent and all rights under the same; and

"Whereas, the Cedarine Allen Company, of Clinton, county of Oneida, and state of New York, is desirous of acquiring the entire interest in the same:

"Now, therefore, to all to whom it may concern, be it known that for and in consideration of the sum of $50,000 to me in hand paid, the receipt of which is hereby acknowledged, I, the said Mary E. Allen, have sold, assigned, and transferred, and by these presents do sell, assign, and transfer, unto the said Cedarine Allen Company my entire right, title, and interest in and to the said trade-mark for furniture polish, and in and to the letters patent therefor aforesaid, the same to be held and enjoyed by the said Cedarine Allen Company for its own use and behoof, and for the use and behoof of its legal representatives, to the full end of the term for which said letters patent are granted, as fully and entirely as the same would have been held and enjoyed by me, had this assignment and sale not been made.

"In witness whereof, I have hereunto set my hand and affixed my seal at Clinton, in the county of Oneida, and state of New York, this 24th day of October, 1898.

"In the presence of                                                M. E. Allen.    [L. S.]
    "Katie Smyth.
    "D. W. Allen."

The transfer from George H. Allen to the Cedarine Allen Company reads as follows:

"Know all men by these presents, that I, George H. Allen, of Clinton, county of Oneida, and state of New York, in consideration of the sum of $7,385 to me in hand paid, the receipt whereof is hereby acknowledged, and in consideration of the assuming of obligations of the business of Cedarine Allen by the Cedarine Allen Company, have sold, transferred, assigned, and set over, and hereby do sell, transfer, assign, and set over unto the Cedarine Allen Company, of Clinton, N. Y., all my right, title, and interest in, to, and under all the accounts appearing on my books to my credit as Cedarine Allen; also all stock furniture, and machinery now at my place of business in Clinton, N. Y., as specified in the schedule hereto annexed and made a part hereof; also the good will of the business conducted by me under the name of Cedarine Allen, to have and to hold the same unto the said Cedarine Allen Company, its successors and assigns, as fully as I would own, hold, and enjoy the same, had these presents not been made.

"In witness whereof, I have hereunto set my hand and seal at Clinton, N. Y., this 24th day of October, 1898.                        Geo. H. Allen.

"State of New York, County of Oneida—ss.:

"On this 29th day of October, 1898, before me personally appeared George H. Allen, to me known to be the same person who executed the foregoing assignment, and duly acknowledged that he executed the same.

                                                "H. W. Mahan,
                                    "Notary Public, Oneida County, N. Y."

[1] I think this trade-mark was effectively transferred to the Cedarine Allen Company. The defendant contends the trade-mark could not be transferred independently of the business, and that its transfer to M. E. Allen, and by her to Cedarine Allen Company, George H. Allen transferring the business direct to that company for another consideration, carried no interest in or ownership of the trade-mark. I think it well settled that the assignment of a trade-mark, disconnected from the business and good will with which it has been connected and used, cannot be made. Paul on Trade-Marks, par. 97, p. 162, and paragraph 117, p. 228; Crossman v. Griggs, 186 Mass. 275, 71 N. E. 560; Falk v. American West Indies Co., 180 N. Y. 445, 73 N. E. 239, 1 L. R. A. (N. S.) 704, 105 Am. St. Rep. 778, 2 Ann. Cas. 216; Lea v. N. H. S. M. Co. (C. C.) 139 Fed. 732; Bulte v. Igleheart, 137 Fed. 492, 70 C. C. A. 76; Carroll v. Duluth, etc. (C. C.) 232 Fed. 675; The Law of Trade-Marks, Hazeltine, 218.

[2] But here, in the manner described, both the trade-mark and the business and good will were transferred to the Cedarine Allen Company, and it seems to have been all a part of one transaction and that the trade-mark was transferred *"in connection with"* the business and the good will thereof and that such was the intent and purpose. The Cedarine Allen Company assumed ownership and applied for and obtained a new trade-mark registration, both in the United States and in England. When Allen transferred the business to the corporation, he passed title to the trade-mark, even if he did not lawfully assign it to M. E. Allen. In Congress & Empire Spring Co. v. High Rock Congress Spring Co., 45 N. Y. 291, 6 Am. Rep. 82, it was held that the name "Congress" as a valid trade-mark on water of a particular spring passed with the purchase of the spring, without any special mention of either the good will or trade-mark. See Kidd v. Johnson, 100 U. S. 617, 620, 25 L. Ed. 769; Peck Bros. & Co. v. Peck Bros., 113 Fed. 291, 298, 51 C. C. A. 251, 62 L. R. A. 81; Brown Chemical Co. v. Meyer, 139 U. S. 540, 547, 548, 11 Sup. Ct. 625, 35 L. Ed. 247; Richmond Nervine Co. v. Richmond, 159 U. S. 293, 300, 16 Sup. Ct. 30, 40 L. Ed. 155.

April 20, 1905, the Cedarine Allen Company filed an application for the registration of the trade-mark "Cedarine," and it was registered in the United States August 22, 1905. July 29, 1899, the Cedarine Allen Company filed an application in Great Britain for the registration of the trade-mark "Cedarine," and it was registered September 13, 1899, on the applicant filing a disclaimer, viz., "No claim is made to the exclusive use of the word 'Cedar.'" The statement and declaration for this trade-mark, in the United States was as follows:

"To All Whom It May Concern:

"Be it known that the Cedarine Allen Company, a corporation duly organized under the laws of the state of New York, and located in the village of Clinton, county of Oneida, in said state, and doing business in said village and elsewhere, has adopted for its use a trade-mark, of which the following is a full, clear, and exact description.

"The trade-mark consists of the word 'Cedarine.'

"This trade-mark has been continuously used by said corporation and those from whom it derived its title since January 1, 1887.

"The class of merchandise to which this trade-mark is appropriated is

cleaning and polishing preparations, and the particular description of goods comprised in said class upon which the said trade-mark is used is furniture polish. It is usually displayed on cans, kegs, bottles, and other receptacles for containing the goods, by placing thereon a printed label on which the described trade-mark is shown, although it may be stenciled or printed or otherwise affixed to any receptacle containing the goods, or it may be placed on tags attached to receptacles containing the goods.        Cedarine Allen Co.,

"By Geo. H. Allen, Vice-Pres.

### "Declaration.

"State of New York, County of Oneida—ss.:

"E. D. Hunter, being duly sworn, deposes and says that she is the secretary and treasurer of the Cedarine Allen Company, the applicant named in the foregoing statement; that she believes the foregoing statement is true; that she believes said corporation is the owner of the trade-mark sought to be registered; that no other person, firm, corporation, or association, to the best of her knowledge and belief, has the right to use said trade-mark, either in the identical form or in any such near resemblance thereto as might be calculated to deceive; that said trade-mark is used by said corporation in commerce among the several states of the United States, and particularly between New York and New Jersey and Pennsylvania, and between the United States and foreign nations, and particularly with the Dominion of Canada; and that the description, drawing, and specimens presented truly represent the trade-mark sought to be registered.                                    E. D. Hunter.

"Subscribed and sworn to before me, a notary public, this 12th day of May, 1905.

"[L. S.]                                      James H. Merwin,

"Notary Public, Oneida Co., N. Y."

The Cedarine Allen Company continued business until September, 1911, when its assets were sold at auction to said George H. Allen, and a written transfer was given of the assets, and December 6, 1911, a formal written transfer of the trade-mark was made to complainant. The Cedarine Allen Company then ceased to do business and closed it up, but Allen has continued the business and the use of the trade-mark. From 1886 down to 1905 no one, except this plaintiff and such corporations, in which Allen was majority stockholder, used the word "Cedarine" on or in connection with furniture polish.

[3] The complainant, and these corporations with which he was connected in business as stockholder and officer, have spent considerable sums of money, running into thousands of dollars, in advertising this Cedarine furniture polish yearly in a great extent of territory, some years more and some years less, and have done quite a large business in Cedarine, varying in amount from year to year. I discover no substantial evidence of intent to abandon the trade-mark, and I see no reason to question its validity. The word "Cedarine" seems to be an arbitrary word. It is not found in the dictionary. We have "cedar," name of a tree, and "cedarn," compound of "cedar" and "n" for "en" meaning "of cedar; made of cedar." The word "Cedarine" had no meaning until complainant coined the word and gave it a meaning. Through and by the use of it this word came to signify his furniture polish.

Does the word "O-Cedar" infringe?

In the compound of complainant, forming his "Cedarine Stove Polish," there can be no substantial doubt that he uses cedar oil in small quantities as one of the ingredients. Many witnesses who know

speak on this subject to the effect that cedar oil is always put in. I think the furniture polish would be just as good, and serve all the purposes of a furniture polish, if no cedar oil were used in compounding it. But this may not be so, and the odor of cedar may not be immaterial.

[4] In law the trade-marks are the same if, when applied to the same class and kind of goods, they so clearly resemble each other as to deceive the ordinary purchaser, who gives such attention to the same as the ordinary purchaser usually gives, and cause such purchaser to purchase the one thing, supposing it to be the other. It is not necessary that the similarity must be such as to deceive and mislead the cautious purchaser. It is sufficient to show the similarity is such as to deceive the ordinary and unwary purchaser. The evidence in this case shows that, with both "Cedarine" and "O-Cedar" placed on the market, persons calling for "Cedarine" are given "O-Cedar" and told by the seller that it is the same. "Cedar" is what gives the name its sound, whether we call for "Cedarine" or "O-Cedar." There is no evidence that the manufacturer of O-Cedar, by its salesmen or otherwise, has instructed or authorized those who deal in O-Cedar to pass it off as Cedarine, or inform purchasers that it is the same as Cedarine; but it is shown that the dealers understood it to be the same, and so inform purchasers, who accept it for Cedarine. Therefore purchasers get O-Cedar when they call for Cedarine, and the complainant loses the sale of Cedarine, and his business is injured.

O-Cedar is made and put on the market by the Channel Chemical Company, of Chicago, Ill., and it is evident that company is participating more or less in the defense. The defendant is a dealer, a seller, and has agents out covering a large part of the state of New York, and extends its business into Pennsylvania and a part of New England. It is evident that selling this furniture polish, made by this complainant, under the name and with the trade-mark thereon, "Cedarine," brought it into general notoriety under that name, and it would quite naturally be known as a cedar furniture polish. With this condition existing, for a rival in the business of manufacturing and selling furniture polish to adopt and use the name "O-Cedar" would excite suspicion, to say the least, that the intent and purpose was to get as close as possible to the name already in use without adopting it absolutely, and appropriate the benefits of the existing name and advertising done and some of the established trade. The word "Cedarine" is not descriptive of the complainant's goods, nor is "O-Cedar" descriptive of the furniture polish sold by the defendant and made by Channel Manufacturing Company. The words give no reasonably accurate or distinct knowledge as to the character and composition of either compound. Keasbey et al. v. Brooklyn Chemical Works, 142 N. Y. 467, 37 N. E. 476, 40 Am. St. Rep. 623.

In American L. P. Co. v. Gottlieb & Sons (C. C.) 181 Fed. 178, "Knox-all" was held to infringe "Beats-all." In Stephano v. Satmatopoulos et al. (D. C) 199 Fed. 451, "Radames" was held to infringe "Rameses." In this last case Lacombe, C. J., said:

"The only question is: Will confusion be likely to result from the use of the name defendants have chosen?"

He then referred to the fact that both words are pronounced with the emphasis on the first syllable and said:

"Assuming that a person, even of average intelligencê, who has smoked a cigarette given him by a friend and found it pleasing, is informed that it is the 'Ram'-es-es' brand, it seems a not unreasonable supposition that he might accept from a dealer a box which he is assured is of the 'Rad'-am-es' brand, believing it to be the same. To me, at least, this seems so likely to occur that infringement of complainants' trade-mark seems obvious."

Here consumers have used "Cedarine" furniture polish, and are pleased with it, and desire to purchase it, and call for it. They are given "O-Cedar." "Cedar" is the controlling word, as the name strikes the eye in both names when seen, as it is when it strikes the ear·when pronounced. It seems to me very clear that confusion is not only liable to arise, but would arise. It is self-evident. Take the first case cited "Knox-all" versus "Beats-all." The *general idea* is the same, although there is no similarity in sound and appearance between "knox" and "beats," and Judge Learned Hand said:

"The second and third objections I shall consider together. I have no difficulty in finding that the phrase 'Knox-all' is an infringement of the phrase 'Beats-all.' There is no such limitation as the defendant·puts upon the infringement of a trade-mark; i. e., that the similarity must go only to the eye and ear. The question cannot be treated in any such technical manner, for always the substantial question is whether the defendant is likely to steal the complainant's trade by the use of the trade-mark in question. I am quite satisfied in this case that there is such similarity between the two phrases as would readily lead in the mind of customers to confusion; a case in point is the infringement of 'Keepclean' by 'Sta-Kleen.' Florence Manufacturing Company v. J. C. Dowd & Co. (C. C. A.) 178 Fed. 73. There are many other, decisions in the books which show that it is not alone similarity to the ear or eye which constitutes infringement."

In Northwestern C. M. Co. v. Mauser & Cressman (C. C.) 162 Fed. 1004, "Ceresota" was held to infringe "Cressota." In Stamford, etc., v. Thatcher, etc. (D. C.) 200 Fed. 324, "Messmate" was held to infringe "Shipmate." There is no similarity in either appearance or sound between "ship" and "mess," but the controlling word in the name is "mate," as here it is "cedar." In Elliott Varnish Co. v. Sears, Roebuck & Co. (D. C.) 221 Fed. 797,· "Roof Leak" is held to be infringed by "Never Leak." In this case the idea conveyed·is not the same, but "leak" is the controlling word, as there is no similarity in appearance or sound between "roof" and "never."

"Cottoleo" was held to infringe "Cottolene" in N. K. Fairbanks Co. v. Central L. Co. (C. C.) 64 Fed. 133, as applied to a substitute for lard; "Chefolene" was held to infringe "Cottolene," as applied to such substitute, in N. K. Fairbanks Co. v. Ogden Packing & Provision Co. (D. C.) 220 Fed. 1002. In Lambert Pharmacal Co. v. Bolton Corporation (D. C.) 219 Fed. 325, "Listogen" is held to infringe "Listerine"; and in W. A. Gaines & Co. v. Turner-Looker, 204 Fed. 553, 123 C. C. A. 79, the words "Golden Heritage" are held to infringe the word "Hermitage." Many other cases might be cited, showing clearly that under the authorities "O-Cedar" is a clear infringement of "Cedarine."

[5] The defendant urges the defense of laches, and also claims that the complainant patented his furniture varnish and gave to it this

name "Cedarine," by which the patented article came to be generally and universally known; that the patent expired prior to the commencement of this action, and that the name and trade-mark went with the patented compound, to which the name was applied to the public. The complainant contends that his statement, made by him at one time, to the effect that he "invented" the furniture polish which he had put on the market, and had sold and was selling as "Cedarine," and to which he had given that name, was a mistake or error made in the zeal of advertising, and that in fact his patented compound was not his "Cedarine," but a different compound or composition, and that "Cedarine" was never patented. In 1900 the complainant put out an advertising pamphlet, called "A Commercial Pilgrim, or Around the World with Cedarine Allen." It contains over 115 pages of printed matter copiously illustrated, and is filled with extravagant and untrue statements, not intended or calculated to deceive, however, but evidently designed to attract attention to Allen and to his furniture polish. This pamphlet contains the following:

"This need of money to the party interested is always felt to be a nuisance, but it's a good thing. It was the connecting link in my case that brought together a world's need and its remedy.

"Needing the money most urgently, and my job not satisfying the need, I invented Cedarine furniture polish which was what the world was groping in darkness for, and didn't know it.

"Ordinarily it would be a piece of egotism for a man to write in such a strain as the above. But what can a fellow do? There's the world's need, there's Cedarine furniture polish, and I invented it. But I don't want to boast. I merely want to state the simple facts.

"I know that a sweet modesty should permeate my being, and that I should clothe myself in all humility, when I consider that the inspiration of Cedarine furniture polish came to me (and that I got it patented). It might have come to some one else. * * *

"From the coasts of Maine to the Keys of Florida, from Puget Sound to Mexico, and in all the land between, furniture dealers to whom I had intrusted the vending of the precious stuff (I sold it to them at a stipulated price per gross) came to know it and to know me. * * *

"But in later life, as I traveled up and down the land, calling upon the trade and speaking in gentle praise of my Cedarine furniture polish, they got to calling me 'Cedarine—Cedarine Allen.' I've often wondered why."

Prior to this, and May 21, 1889, Allen had applied for and obtained letters patent No. 403,715, with a single claim, viz.:

"The herein described composition of matter to be used for furniture polish, consisting of oil of cedar, linseed oil, and turpentine in substantially the proportions specified."

Originally in the specifications Allen stated that his application was for the combination of the aromatic oil of cedar with a suitable vehicle to render the compound aromatic and serve as a moth preventive. Such a claim was rejected, and the patent was cut down and limited to the claim above quoted. The compound or composition actually made and sold by Allen is not linseed oil, but a petroleum product, and that which Allen has put up, compounded, and sold for years, and since the patent issued, as and under the name of "Cedarine," is not the patented article or compound. In short, even if Allen intended, at the time of obtaining his patent and registering his trade-

mark, to make and sell the patented composition of matter as "Cedarine," he never did, and the name "Cedarine" became attached to a different product or composition. For this reason I am of the opinion this trade-mark did not go to the public with the expiration of the patent on a composition of matter to which the name never in fact attached. There is no evidence that the patented compound was ever manufactured and put on the market, to any extent at least, and several witnesses testified it was not. True, the patent issued May 21, 1887, No. 403,715, and the registration of the trade-mark was effected June 26, 1887, and the statement in the pamphlet quoted was made and published to the world in 1900, about three years later; but Allen was not then making or selling the patented article, but the compound to which the name "Cedarine" actually attached. I do not think Allen can be or should be concluded by that random statement in the pamphlet under such circumstances. It does not appear that Allen ever marked the "Cedarine" actually put on the market and sold as such "Patented," or claimed that it was patented, except once, as set forth in the pamphlet. This case is not, therefore, like or within Horlick's Food Co. v. Elgin Milkine Co., 120 Fed. 264, 56 C. C. A. 544, or Yale & Towne Mfg. Co. v. Ford, 203 Fed. 707, 122 C. C. A. 12, where it was held:

"Where the maker of a patented article marked it as patented, and also designated it by an arbitrary name by which it became known to the public, on the expiration of the patent other manufacturers, having the right to make the article, had also the right to use the name, provided they took proper care to prevent their product from being confused with that of the original maker."

There can be no quarrel with the well-established principle that where a person invents a machine or a composition of matter, and makes it and puts it on the market, marked "Patented," and attaches thereto a trade-name, and goes to the extent of registering this name as his trade-mark, and it is used solely for that patented article or composition, and the name becomes inseparably connected with such patented thing, so as to indicate a patented article or thing, on the expiration of the patent it becomes public property, and the public may also use the name in connection with that article, which it is free to make and sell. But here the complainant, so far as appears, and there is substantial evidence he did not, did not make or sell his patented composition, but another, which was not marked or claimed to be patented (except in the single case of the pamphlet), and hence the trade-mark never became associated with the patented composition.

In the Yale Case, supra, the court said:

"To us it is clear the commercial value of a patent is the creation of a public desire for its product. And if the invention is such that its product has acquired a distinctive name, then the public, when its time of enjoyment comes, cannot enjoy to the full the freed invention, unless coupled thereto is the right to use the name by which alone the invented article is known. Nor is there injustice in this, for, when the real situation is analyzed, it will be seen that by enjoying the monopoly of his patent for a series of years the patentee impliedly agrees, as maker and seller of the invented article, that, when his patent expires, he will not only surrender to the public the mechanical right to duplicate the article, but also the distinctive name the public

has appropriated to the patented article; for it is apparent that the public cannot use the invention to the full without having the incidental right to vend its product by the distinctive name which the public has given it. In other words, taking this case, the public cannot now enjoy an untrammeled right to make the Triplex block of the 17-year monopoly, unless it has the incidental right of saying we now make and sell a Triplex block. Any other construction would make the patent a mere incident to trade-names, and would nullify the basis which alone justifies the grant of patented rights, namely, the right, on the expiration of the patent, to the full commercial use of the freed invention."

In the Horlick Case, supra, the headnote is:

"Where the manufacturer of an article, to which he gave a name, by which it became known, placed upon the packages in which it was sold to the public a notice in the usual form that the article was made under a patent, the right to the exclusive use of the name as a trade-name expires with the expiration of the patent, whether the article was in fact made in accordance with the patent or not."

In Singer Mfg. Co. v. June Mfg. Co., 163 U. S. 169, 16 Sup. Ct. 1002, 41 L. Ed. 118, the holding is:

"Where, during the life of a monopoly created by a patent, a name, whether it be arbitrary or be that of the inventor, has become, by his consent either express or tacit, the identifying and generic name of the thing patented, this name passes to the public with the cessation of the monopoly which the patent created. Where another avails himself of this public dedication to make the machine and use the generic designation, he can do so in all forms, with the fullest liberty, by affixing such name to the machines, by referring to it in advertisements, and by other means, subject, however, to the condition that the name must be so used as not to deprive others of their rights, or to deceive the public, and therefore that the name must be accompanied with such indications that the thing manufactured is the work of the one making it as will unmistakably inform the public of that fact."

In Merriam Co. v. Syndicate Publishing Co., 237 U. S. 618, 622, 35 Sup. Ct. 708, 709 (59 L. Ed. 1148), this is approved, and the court held:

"As is the case with patents, so after the expiration of copyright securing the exclusive right of publication, the further use of the name by which the publication was known and sold cannot be acquired by registration as a trade-mark. Merriam v. Holloway Co. [C. C.], 43 Fed. 450, approved. And see Singer Manufacturing Co. v. June, 163 U. S. 169 [16 Sup. Ct. 1002, 41 L. Ed. 118]."

I cannot doubt that Allen, at the time he first registered his trade-mark "Cedarine," had it in mind to apply the name to his patented composition, furniture polish; but he did not manufacture and sell, or put on the market, that patented composition, furniture polish, but another, not patented, and one which he did not mark or represent as patented (except in the one instance fully referred to), and to this other composition, not patented, he actually and consistently applied the name "Cedarine," and it was to this other composition that reference was made at the time the registration of the second trade-mark "Cedarine," was applied for and made. The name or trade-mark "Cedarine" never became attached to or connected or associated with the patented article. Hence it did not pass to the public on the expiration of complainant's patent.

235 F.—16

[6] The defense of laches presents greater equities. There is some evidence that the name "O-Cedar," applied to furniture polish, was used as early as 1908, and since that time it has been on the market to some extent. One witness said O-Cedar was sold in Chicago or that vicinity in 1910. March 11, 1912, the Channel Chemical Company applied for registration of the name "O-Cedar" as its trademark for its furniture polish. · It was not registered until August 18, 1914, as registration was twice refused by the officials of the United States on account of the prior registration and use of the name "Cedarine," holding that "O-Cedar" and "Cedarine" were so similar as to be likely to lead to confusion, and also because "O-Cedar" was descriptive. These rejections took place April 1, 1912, when the examiner said, "Applicant's mark so closely resembles the registered trade-mark"—referring to "Cedarine"—"as to be apt to cause confusion in the trade," which was a proper conclusion, and May 21, 1913, when the rejection was made final. Thereupon counsel (not the facts) was changed, whereupon the decision was reversed, and the word "O-Cedar" was held *not* descriptive (and it is not) and that as the office had held that "Lax-o-cap" is not similar to "Laxo," while it is, and that "Chola-sol" is not similar to "Chologen," it would hold, which it did after some two years consideration *and a change of lawyer*, on the same facts, that "O-Cedar" is not so similar .to "Cedarine" as to cause confusion. Actual experience has proven, however, that the similarity is so great that the one is sold quite generally for the other and accepted as the same.

It is urged that complainant has not applied to cancel the registration of "O-Cedar" and that he did not oppose registration. It is not shown that the complainant had any information of this application for the registration of "O-Cedar." The complainant also has the right to appeal to the courts, but he delayed a considerable time after he must have known that "O-Cedar" furniture polish was on the market under that name in competition with "Cedarine" furniture polish. If Allen, engaged as he was in manufacturing, advertising, and selling his furniture polish, "Cedarine," *had knowledge* for years that Channel Manufacturing Company was manufacturing, advertising, and selling O-Cedar furniture polish under that name, in competition with Cedarine, and expending considerable sums of money in building up the trade, and has not objected or protested until by this suit against a dealer, it would seem inequitable, after the business and trade in O-Cedar has been thus built up at large expense and made a success, to interfere by injunction and destroy the business thus established. But I find no substantial or convincing testimony that Allen has improperly or negligently "slept upon his rights" since actual knowledge of the infringement of his trade-mark came to him. The defendants, Walker & Gibson, commenced purchasing and selling O-Cedar polish December 11, 1913, and this suit was commenced within two years thereafter. The extent of the business of Channel Manufacturing Company does not clearly appear, and when knowledge of it first actually came to Allen does not appear at all.

In Menendez v. Holt, 128 U. S. 523, 524, 9 Sup. Ct. 143, 145 (32

L. Ed. 526), the Supreme Court, per Mr. Justice Fuller, thus states the law as to laches as applied to the infringement of a trade-mark or trade-name:

"The intentional use of another's trade-mark is a fraud; and when the excuse is that the owner permitted such use, that excuse is disposed of by affirmative action to put a stop to it. Persistence then in the use is not innocent; and the wrong is a continuing one, demanding restraint by judicial interposition when properly invoked. Mere delay or acquiescence cannot defeat the remedy by injunction in support of the legal right, unless it has been continued so long and under such circumstances as to defeat the right itself. Hence, upon an application to stay waste, relief will not be refused on the ground that, as the defendant had been allowed to cut down half of the trees upon the complainant's land, he had acquired, by that negligence, the right to cut down the remainder (Attorney General v. Eastlake, 11 Hare, 205); nor will the issue of an injunction against the infringement of a trade-mark be denied on the ground that mere procrastination in seeking redress for depredations had deprived the true proprietor of his legal right (Fullwood v. Fullwood, 9 Ch. D. 176). Acquiescence to avail must be such as to create a new right in the defendant. Rodgers v. Nowill, 3 De G., M. & G. 614. Where consent by the owner to the use of his trade-mark by another is to be inferred from his knowledge and silence merely, 'it lasts no longer than the silence from which it springs; it is, in reality, no more than a revocable license.' Duer, J., Amoskeag Mfg. Co. v. Spear, 4 N. Y. Super. Ct. 599; Julian v. Hoosier Drill Co., 78 Ind. 408; Taylor v. Carpenter, 3 Story, 458 [Fed. Cas. No. 13,784]; s. c., 2 Woodb. & M. 1 [Fed. Cas. No. 13,785]. So far as the act complained of is completed, acquiescence may defeat the remedy on the principle applicable when action is taken on the strength of encouragement to do it; but, so far as the act is in progress and lies in the future, the right to the intervention of equity is not generally lost by previous delay, in respect to which the elements of an estoppel could rarely arise. At the same time, as it is in the exercise of discretionary jurisdiction that the doctrine of reasonable diligence is applied, and those who seek equity must do it, a court might hesitate as to the measure of relief, where the use, by others, for a long period, under assumed permission of the owner, had largely enhanced the reputation of a particular brand."

In Layton Pure Food Co. v. Church & Dwight Co., 182 Fed. 24, 104 C. C. A. 464, the Circuit Court of Appeals, Eighth Circuit, held that the infringement of a common-law trade-mark is a continuing trespass upon the rights and property of the owner. Also:

"The owner of a trade-mark is not chargeable with laches for a failure to prosecute an infringer before he knows or has such notice as would lead an ordinarily prudent person to inquire and learn the existence of the infringement. It is not his duty to search out and discover it because the presumption is that parties will abide by the law and respect his rights."

This is also held in Saxlehner v. Eisner & Mendelson Co., 179 U. S. 19, 39, 21 Sup. Ct. 7, 45 L. Ed. 60.

In McLean v. Fleming, 96 U. S. 245, 24 L. Ed. 828, there had been a delay of some 20 years in instituting proceedings, but the court said:

"Equity courts will not, in general, refuse an injunction on account of delay in seeking relief, when the proof of infringement is clear, even though the delay may be such as to preclude the party from any right to an account for past profits."

So in that case, while an injunction was granted, an accounting was refused. This case was cited and approved in 179 U. S. 19, supra. In Bissell Chilled Plow Works v. T. M. Bissell Plow Co. (C. C.) 121

Fed. 357, 375, after referring to McLean v. Fleming, supra, and Menendez v. Holt, supra, the court said:

"Simple laches, without more, which is the case here, is not sufficient to interfere with a complainant's right to injunctive relief, though it may affect his right to damages for past infringement."

If a party should register a trade-mark and for several years allow another to use on the same class of goods competing with his, if made, a name so like his as to show clear infringement of such trade-mark, and make no objection or protest, having full opportunity so to do, and knowingly permit such other to expend large sums of money in advertising and exploiting his goods under such name, he neither making nor selling his goods to which the trade-mark name was applied by him, and hence not use the trade-mark, we would have a case for finding abandonment of such trade-mark, or, at least, such laches as would bar injunctive relief. But here we do not have proof of facts showing abandonment or fraudulent conduct on the part of Allen in any way affecting or misleading the defendant or the Channel Manufacturing Company. It is a serious thing to interfere with business by injunction, and ought not to be done when the case is doubtful; but courts must not hesitate when a clear case is presented.

The defendant here has energetically and vehemently attacked Allen, the complainant, for his conduct in connection with the corporations with which he was connected and before referred to; but there is no evidence that any creditor of those corporations or any stockholder has complained of his acts at any time or in any manner. The acts of Allen complained of and denounced by the defendant in no way affected the defendant or the Channel Manufacturing Company. Such acts had nothing to do with inducing the said Channel Company to adopt and use the name "O-Cedar," or expend money in exploiting its product. The evidence and exhibits show that Allen is a unique character, a man who does things in a manner peculiarly his own, and he has word-pictured himself as "a man of many schemes"; but I fail to find he was dishonest, or that his "many schemes" were designed to cheat or defraud any one. He was "scheming" to get his "Cedarine" on the market and sell it. I am inclined to think he overdid the matter (examine Plaintiff's Exhibit 25, "A Commercial Pilgrim," and its illustrations), and that people, and even dealers, took him, in many instances, as a joke, and his "Cedarine" and advertising in the same way; but all this is no excuse or justification for the defendant or the Channel Manufacturing Company, if the complainant's trade-mark be valid. It has not induced their conduct in any degree or manner, unless it be that the Channel Manufacturing Company, finding Cedarine on the market as a furniture polish and extensively advertised, conceived the idea of also putting "O-Cedar" on the market in competition.

[7] It has been urged that the disclaimer of the word "Cedar" alone by Allen in the British Patent Office, when he applied there for registration of "Cedarine," and as a condition of securing such registration in Great Britain, operated and operates as a disclaimer everywhere and in the United States. But the trade-mark is "Cedarine," an arbitrary

word, and not "Cedar." No such disclaimer was requested or required by the United States Patent Office, and the proceedings there show nothing of the kind. I am at a loss to understand why a compliance with the laws, rules, and regulations of the kingdom of Great Britain in securing registration of a trade-mark there operates to limit or destroy the rights secured by registration of a trade-mark in the United States, even though it be the same. Great Britain, in registering trade-marks, may limit and restrict their scope and effect as she sees fit, and the United States may do the same.

On the argument defendant's counsel cited and referred to Holzapfels Co. v. Rahtjens Co., 183 U. S. 1, 22 Sup. Ct. 6, 46 L. Ed. 49. That case does not hold that where a citizen of the United States applies for and obtains in England the registration of a designated trade-mark, and in order to obtain it disclaims the exclusive right to the use of a certain word or certain words forming a part of the trademark claimed and applied for, and also applies for registration of the trade-mark in the United States for which he asked registration originally in England, and obtains registration of the trade-mark applied for in the United States, without making any disclaimer, that the latter registration granted and made in the United States is either void or no broader than the British registration. What it does hold is stated in the headnotes thus:

"This was a controversy relating to a trade-mark for protective paint for ships' bottoms. The court held: (1) That no valid trade-mark was proved on the part of the Rahtjens Company in connection with paint sent from Germany to their agents in the United States, prior to 1873, when they procured a patent in England for their composition; (2) that no right to a trademark which includes the word, 'patent,' and which describes the article as 'patented,' can arise when there has been no patent; (3) that a symbol or label claimed as a trade-mark, so constituted or worded as to make or contain a distinct assertion which is false, will not be recognized, and no right to its exclusive use can be maintained; (4) that of necessity, when the right to manufacture became public, the right to use the only word descriptive of the article manufactured became public also; (5) that no right to the exclusive use in the United States of the words 'Rahtjen's Compositions' has been shown."

On the subject of disclaimer the assignee in the United States was held bound by the disclaimer made by his assignor in England. In other words, the rights of the assignee were no greater than those of his assignor. As to the one trade-mark, it was held void, for the reason it had been applied to a patented article, and the right thereto had expired with the patent and became public property; and as to the other, that the assignee was bound in the United States by the disclaimer made by the assignor in England. Judge Peckham, in giving the opinion of the court, said:

"The respondent claims the right to use these words by virtue of assignments from the Messrs. Rahtjen and also Suter, Hartmann & Co. in England, and also by virtue of a domestic trade-mark which it or its predecessors had acquired from user and registration in the United States. The rights of Suter, Hartmann & Co. to the exclusive use of these words had been disclaimed by them in 1883, long before any assignment of their rights to the respondent, and we do not see why that disclaimer should be confined to England. It was a general disclaimer of any right whatever to the exclusive use of these words, and it was only upon the filing of that disclaimer that they

obtained the trade-mark which they did in England. The disclaimer, however, was as broad as it could be made. When they assigned their rights, the assignment did not include a right to an exclusive use which, in order to obtain the trade-mark registration, they had already disclaimed. The assignment of the Rahtjen firm could not convey the exclusive right to the use of such words, because they had no valid trade-mark in those words prior to 1873, and by the expiration of the English patent in 1880 the right to that use had become public. These various assignors, therefore, did not convey by their assignment a right to the exclusive use of the words in the United States. The domestic trade-mark, which the respondent also claims gives it that right, was not used until after the sale of the composition by the petitioner in the United States under the name of 'Rahtjen's Composition, Holzapfel's Manufacture.' We think the principle which prohibits the right to the exclusive use of a name descriptive of the article after the expiration of a patent covering its manufacture applies here."

[8] It is urged that Allen should not maintain this suit, for the reason he does not come into court with clean hands. He who seeks equity must do equity; but this has reference to the matters with which the court is dealing and the parties are concerned. The contention, on the facts, may be summarized in this way: It is claimed Allen on his own statement was guilty of sharp practice in obtaining title to this trade-mark after once parting with it, and did not pay therefor and for the business with which it was connected adequate consideration, and that his label contains one or more misrepresentations calculated to deceive the public. Attention has been called to the transfers referred to. The label on the bottles contain the following:

"4 fluid Oz. CEDARINE Piano & Furniture Polish, the finest preparation in the world for cleaning and renewing all kinds of finished woods. It removes grease, scratches, fly-specks, mars, finger marks and is an excellent preventive against moth. Price 25 cts. Cedarine Co., Clinton, N. Y., Sole Manufacturers. Trade-Mark registered June 7, 1887. Reasons why CEDARINE should be used in preference to any other polish:

"1st.—It is manufactured from cedar trees and other compounds used to produce the polish on the finest pianos and furniture.

"2nd.—The cedar odor permeates the woolen goods in the rooms where it is used, thus serving as an excellent moth preventive.

"3rd.—There can positively no harm come to your furniture by its use. On the contrary, from its very nature it is calculated to renew and preserve the original finish of all articles on which it is used."

I do not know why the odor of cedar will not permeate woolen fabrics. It was not proved that it will not. The statement that it "is an excellent preventive against moth," and that, permeating woolen fabrics, it is "thus serving as an excellent moth preventive," may be true and may be incorrect. The evidence will not justify a finding that the statements are false. In his application for letters patent as amended Allen said:

"In carrying out my invention, I combine with the aromatic oil of cedar, or a compound or extract made from cedar wood or boughs, a suitable vehicle consisting of linseed oil and turpentine to render the compound aromatic and serve as a moth preventive.

"I prefer to use a vehicle consisting of ten parts of linseed oil, ten parts of turpentine, and two parts of alcohol, to which one part of the oil of cedar is added to give the aromatic flavor to the compound, the whole being thoroughly mixed by agitation. * * *

"I have found by practical use of the herein described polish that it thoroughly and quickly cleanses furniture, pianos, etc., restores the original lustre or color to the article treated, and imparts to the furniture an aromatic flavor which acts as an effective moth preventive."

Of this the examiner said:

"By reference to page 360 of Beasley's Druggists' Ret Book, 1857, applicant will find that to the ordinary furniture polish he adds as an insecticide the most common agent known 'as a moth preventive.' The first serves simply as a vehicle (as shown on page 529 of the 14th Ed. U. S. Disp. and page 292, Griffith's Formulary), but neither aids, assists, nor modifies the insecticide; that is, the new mixture has neither value nor usefulness beyond the obvious addition of the values of the simples employed, and the changes made give only the most obvious results from the known qualities of the matter employed, which is but colorable and at the most exhibits but ordinary skill and judgment."

Reply was made by Allen's attorneys July 26, 1887, containing the following:

"Applicant admits that the aroma or scent of cedar directly from the wood has been used as a moth preventive, but he is not aware that when used in that *manner* it amounts to an insecticide, but in the form in which we prepare and apply the cedar it would."

Thus the whole matter was called to the attention of the Patent Office, and that office conceded that oil of cedar is an insecticide, and finally, it seems, to be a "moth preventive." I do not see that Allen can be charged with fraud or misrepresentation, even if it be true that the odor of oil of cedar will not permeate woolen goods or act as a moth preventive. If, as the Patent Office examiner conceded, it is an "insecticide," it would seem to be a legitimate conclusion that it is a "moth preventive." It may be outside the record, but our great-grandmothers, our grandmothers, and our mothers have used cedar for this purpose, and those living still pack our woolen clothing in cedar boughs to "keep out the moths." I am not willing to charge Allen with fraudulent conduct in stating that oil of cedar is a moth preventive and that its odor will permeate woolen clothing, or that the oil of cedar is derived from cedar trees.

On the label on a bottle of O-Cedar I find the following: "Kills all germs. Excellent for dusting." This exhibit was purchased on the market at Herkimer, N. Y., April 12, 1916. I think it safe to assert that a mixture which "kills all germs" will act as a "moth preventive." Even if the Channel Company has abandoned the use of this statement, it is convincing that it once believed its truth, or intended to deceive if it knew it would not "kill all germs." It has been said and held many times that a court of equity should not and will not pronounce a judgment or decree which will secure to another the exclusive right to deceive and defraud another or others by false representations and statements, and so it was held, as we have seen, that a trade-mark applied or to be applied to an article, which mark contained the false, and therefore fraudulent, statement that the article is "patented," when it was not, would not be registered, or, if registered, would be held void. But here there is no pretense of any false statement or representation in the trade-mark "Cedarine."

[9] I think complainant's trade-mark valid and infringed by defendant in selling "O-Cedar," the same kind and class of goods, used for the same purpose; but it seems to me that defendant ought not to be put to the expense of an accounting. Their sales have been small, and they were not notified of the alleged infringement, or that infringement was claimed, until suit was brought. Walker & Gibson have been selling the two polishes, "Cedarine" and "O-Cedar," side by side, for some two years, and it would seem complainant ought to have known the fact. No request to desist was made and no warning given. There is no evidence that the defendant has sold "O-Cedar" as and for "Cedarine," or made any misrepresentations.

The recent cases of Hamilton Shoe Co. v. Wolf Bros., 240 U. S. 251, 36 Sup. Ct. 269, 60 L. Ed. 629, which holds that "American Lady" infringes "The American Girl," and is to that extent in point, and Hanover Star Milling Co. v. Metcalf, 240 U. S. 403, 36 Sup. Ct. 357, 60 L. Ed. 713, while instructive on the subject of trade-marks, are not, further than indicated, in point.

There will be a decree in favor of the complainant for an injunction, with costs.